The **CHICAGO RIVER AND INDIANA RAILROAD COMPANY** et al., Plaintiffs-Appellants,

v.

**BROTHERHOOD OF RAILROAD TRAINMEN** et al., Defendants-Appellees.

No. 11474.

United States Court of Appeals Seventh Circuit.

Feb. 6, 1956.

Rehearing Denied March 5, 1956.

Walter J. Cummings, Jr., Marvin A. Jersild, Chicago, Ill., Kenneth F. Burgess, Wayne M. Hoffman, William K. Bachelder, Chicago, Ill., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for appellants.

Edward B. Henslee, William C. Wines, Martin K. Henslee, John J. Naughton, Chicago, Ill., for appellees.

Before FINNEGAN, LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

By amended complaint the Chicago River and Indiana Railroad Company[1] and 27 other railroads prayed for an injunction to restrain the Brotherhood of Railroad Trainmen[2] from calling a threatened strike against the River Road. Trainmen's counsel state that the purpose of said strike is to settle 21 grievances and claims through collective bargaining rather than by an award of the National Railroad Adjustment Board.[3] The district court granted a restraining order which was later dissolved when the court decided that the Norris-LaGuardia act was applicable and, therefore, it lacked jurisdiction to grant the relief sought. It dismissed the cause. The court subsequently granted an injunction pending the determination of this appeal, which was taken from the judgment of dismissal.

The grievances of the employees involved are 19 claims for additional compensation, 1 claim for reinstatement to a higher position, and 1 claim for reinstatement to the employ of the River Road. Each of these claims was presented to the railroad superintendent who handles such cases. Each was appealed to the highest railroad officer designated to handle claims under § 3, First (i) of the Railway Labor Act, 45 U.S.C.A. § 153, First (i), and was denied by him.

The amended complaint charges that this strike would halt the operations of all trains into and out of the Chicago Stockyards, force the River Road to lay off 1,100 employees, who would lose in excess of $12,000 a day in wages, cost the

1. Sometimes referred to herein as "River Road".

2. Sometimes referred to herein as "Trainmen".

3. Sometimes referred to herein as the "Board".

company thousands of dollars a day, and require the embargo of all shipments into and out of the Stockyards, causing irreparable damage to the 27 railroads (the other plaintiffs) and the 600 industries served. The Trainmen's answer alleges that they do not have sufficient information to form a belief as to the truth or falsity of these charges and, therefore, they deny the same. The amended complaint was dismissed without the taking of evidence.

The amended complaint and the answer show that the River Road, on July 15, 1954, submitted to the Board the claims in dispute and the Board has not yet rendered a decision on any of them.

The first contested issue herein, as stated by the Trainmen, is: "Does the Railway Labor Act prohibit a union from striking over claims and grievances, matters which are within the jurisdiction of the National Railroad Adjustment Board?" Plaintiffs say that it is mandatory under the Railway Labor Act that minor disputes [4] be adjusted instead of being made the subject of a strike. They contend that such command must be enforced, even though the act itself does not provide enforcement machinery, and that an injunction is appropriate to this end. The Trainmen contend that the Railway Labor Act does not prohibit a union from striking over claims and grievances though such matters are within the jurisdiction of the Board. Their answer avers that the effect of the strike, if successful, would be settlement of said disputes through collective bargaining instead of by award of the Board.

1(a). The Railway Labor Act of 1926, as amended in 1934,[5] expressly states its purposes,[6] the first of which is "To avoid any interruption to commerce or to the operation of any carrier engaged therein;" and the fifth of which is "to provide for the prompt and orderly settlement of all disputes growing out of grievances * * *."

The difference between disputes over grievances and disputes concerning the making of collective agreements is traditional in railway labor affairs. It has assumed large importance in the Railway Labor Act of 1934, substantively and procedurally. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, at page 722, 65 S.Ct. 1282, at page 1289, 89 L.Ed. 1886. As to disputes over grievances, the act contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. Such a dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. So-called minor disputes, involving grievances, the 1934 act sets apart from major disputes and provides for them very different treatment. The court said, 325 U.S. 724, 65 S.Ct. 1290:

"The Act treats the two types of dispute alike in requiring negotiation as the first step toward settlement and therefore in contemplating voluntary action for both at this stage, in the sense that agreement is sought and cannot be compelled. To induce agreement, however, the duty to negotiate is imposed for both grievances and major disputes.

"Beyond the initial stages of negotiation and conference, however, the procedures diverge. 'Major disputes' go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration, cf. § 7; [Brotherhood of Railroad] Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534; and finally to possible presidential intervention to secure adjustment. § 10. For their settlement the statutory scheme retains throughout the traditional voluntary

---

**4.** It is agreed that the claims and grievances which are the subject of the suit at bar are all so-called "minor disputes".

**5.** 45 U.S.C.A. § 151 et seq.

**6.** Ibid. § 151a.

processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5, First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration.

"The course prescribed for the settlement of grievances is very different beyond the initial stage. Thereafter the Act does not leave the parties wholly free, at their own will, to agree or not to agree. On the contrary, one of the main purposes of the 1934 amendments was to provide a more effective process of settlement.

"Prior to 1934 the parties were free at all times to go to court to settle these disputes. * * * Several organizations took strike ballots and thus threatened to interrupt traffic, a factor which among others induced the Coordinator of Transportation to become the principal author and advocate of the amendments. The sponsor in the House insisted that Congress act upon them before adjournment for fear that if no action were taken a railroad crisis might take place. * * * the Adjustment Board was created and given power to decide them."

The court then said, 325 U.S. 727, 65 S. Ct. 1291:

"The procedure adopted is not one of mediation and conciliation only, like that provided for major disputes under the auspices of the Mediation Board. Another tribunal of very different character is established with 'jurisdiction' to determine grievances and make awards con-

cerning them. Each party to the dispute may submit it for decision, whether or not the other is willing, provided he has himself discharged the initial duty of negotiation. § 3, First (i). Rights of notice, hearing, and participation or representation are given. § 3, First (j). In some instances judicial review and enforcement of awards are expressly provided or are contemplated. § 3, First (p); cf. § 3, First (m). When this is not done, the Act purports to make the Board's decisions 'final and binding.' § 3, First (m)."

The procedure prior to 1934 was in fact and effect nothing more than one for voluntary arbitration. No dispute could be settled unless submitted by agreement of all parties. The Board was created to remove the settlement of grievances from this stagnating process and bring them within a general and inclusive plan of decision. The aim was not to dispense with agreement. It was to add decision where agreement fails and thus to safeguard the public as well as private interests against the harmful effects of the preexisting scheme. Elgin, J. & E. R. Co. v. Burley, supra, 325 U.S. 727, 65 S.Ct. 1292.

At a hearing before a senate committee on the bill for the 1934 amendments, the Railroad Brotherhoods' representative, Mr. Harrison, stated:

"'These *railway labor organizations have always opposed compulsory determination of their controversies.* We have lived a long time and got a lot of experience, and we know that these minor cases that develop out of contracts that we make freely, and * * * *we are now ready to concede that we can risk having our grievances go to a board and get them determined, and that is a contribution that these* organizations are willing to make'". 325 U.S. 728, note 24, 65 S.Ct. 1292.

■ As to major disputes, the act requires the parties to submit to the successive procedures designed to induce

agreement. § 5, First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. That means, that as to disputes over the formation of collective agreements or efforts to secure or change them, the issue not being whether an existing agreement controls the controversy, the act recognizes the right of employees to strike, but postpones such action until the successive procedures set up by the act have been exhausted. No authority is empowered to decide this dispute, unless the parties agree to arbitration.

■ On the other hand, as to minor disputes, such as those relating to grievances and claims, either party may submit a dispute to the Board for decision, *whether or not the other is willing*, provided he himself has discharged the initial duty of negotiation. Except in instances where judicial review and enforcement of awards are expressly provided for or contemplated by the act, § 3, First (p); cf. § 3, First (m), the Board's decisions are final and binding. We hold this to mean that a strike in regard to such minor disputes, or the Board's decisions thereon, would be illegal.

(b). Plaintiffs contend that, inasmuch as it is mandatory under the Railway Labor Act that grievances be adjusted on a submission by either party and that they cannot be the subject of a strike, such command must be enforced, even though the act itself does not provide enforcement machinery. The Trainmen deny this conclusion, "because no provision of the Railway Labor Act prohibits a strike over grievances * * *."

In speaking of the Railway Labor Act of 1926, in Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, the court was discussing an injunction granted by a district court restraining the railroad company from interfering with its clerical employees in the matter of their organization for the purposes set forth in that act. At page 569 of 281 U.S., at page 433 of 50 S.Ct., it said:

"The creation of a legal right by language suitable to that end does not require for its effectiveness the imposition of statutory penalties. Many rights are enforced for which no statutory penalties are provided. * * * The right is created and the remedy exists."

The court affirmed the decree granting the injunction. To the same effect are Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, Steele v. Louisville & N. R. Co., 323 U. S. 192, at page 207, 65 S.Ct. 226, 89 L. Ed. 173, and Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283.

■ We, therefore, hold that the district court has jurisdiction to issue an injunction restraining the Trainmen from striking over grievances and claims, unless the Norris-LaGuardia act prevents or limits the court's power so to do.

■ 2. The Trainmen say that the second contested issue herein is: "Did the Trial Court err in holding that the Norris-LaGuardia Act was applicable and that it therefore lacked jurisdiction to grant the relief sought by the plaintiffs?" Plaintiffs respond that the Norris-LaGuardia act does not prevent the federal courts from issuing injunctions to enforce compliance with the provisions of the Railway Labor Act. The Trainmen argue that the Norris-LaGuardia act has divested the trial court of jurisdiction to grant the injunction sought against the threatened strike. They take the position that "no restraining order or injunction can be issued enjoining any actual or threatened strike unless the terms and conditions of the Norris-LaGuardia Act are fully complied with. Defendants so contend that such is the law even assuming that the provisions of the Railway Labor Act, here involved, will be violated by the threatened strike."

In enacting the Norris-LaGuardia act in 1932[7] congress sought to correct many of the alleged abuses of the injunctive remedy which labor disputes had bought to national prominence during the quarter century preceding the act. In so doing congress purported to cover the general area comprehended by the term "labor dispute" irrespective of the parties involved or the possibilities of any special situation which might arise. The vital and unique position of the railroad industry in the economy of this country, coupled with experience acquired after the act's enactment, demonstrated in 1934 the need for special methods and techniques of handling labor disputes affecting railroads which were so distinctive as to require special treatment in the public interest.

■ Accordingly, the 1934 amendments to the Railway Labor Act were enacted. They provided *inter alia* for compulsory and determinative adjustment of minor disputes. As we have already seen, the compulsory features of the Railway Labor Act are enforceable by injunctions issued by the federal district courts. We cannot presume that congress, in so amending the Railway Labor Act in 1934, intended that such an injunction could not issue unless compliance was first had with the act of 1932 dealing with the general subject of injunctions in labor disputes.

■ The Railway Labor Act, as amended in 1934, embodies a complete plan for avoiding any interruption to commerce or to the operation of any carrier engaged therein.[8] It is directed to the needs of the railroad industry, employers and employees alike, having in mind the paramount interest of the public. It does not call for the aid of, or submit to, the limitations of the Norris-LaGuardia act. Indeed, the provisions in regard to injunctions prohibiting strikes in labor disputes, as contained in the Norris-LaGuardia act, if controlling in a situation such as we have here, arising under the Railway Labor Act, would practically render the compulsory features of the latter act nugatory. We are unimpressed with the argument of Trainmen's counsel that damages suffered by the many persons who might be injured by such a strike could be compensated in private suits brought therefor. A right to relief by suit for damages in such a situation would be an illusory remedy and a poor protection of the public interest. The effect of a strike against the railroads of the nation requires the expeditious intervention of a court to safeguard that interest. This can be accomplished only by the prompt employment of a court's equitable powers, primarily its injunctive power. The compulsion inherent in the Railway Labor Act requires prompt and effective use of judicial machinery and, there being no clear intention contained in that act to the effect that the Norris-LaGuardia act prohibits or limits the issuance of injunctions to implement the Railway Labor Act, we hold that the Norris-LaGuardia act does not apply to the case at bar.

■ As was said in Cook County National Bank v. United States, 107 U.S. 445, 2 S.Ct. 561, at page 566, 27 L.Ed. 537, at page 539:

"A law embracing an entire subject, dealing with it in all its phases, may thus withdraw the subject from the operation of a general law as effectually as though, as to such subject, the general law were in terms repealed. The question is one respecting the intention of the legislature."

When considering the effect of the 1934 amendment which added new provisions in § 2, Ninth, of the Railway Labor Act, in Virginian Ry. Co. v. System Federation, 300 U.S. 515, at page 545, 57 S.Ct. 592, at page 598, 81 L.Ed. 789, the court said:

"Neither the purposes of the later act, as amended, nor its provisions when read, as they must be, in the light of our decision in the Railway

---

7. 29 U.S.C.A. § 101 et seq.

8. 45 U.S.C.A. § 151a.

Clerks case, supra, lend support to the contention that its enactments, which are mandatory in form and capable of enforcement by judicial process, were intended to be without legal sanction."

The court held that a decree for a mandatory injunction granted by a district court, for the purpose of enforcing the provisions of § 2, Ninth, of said act, was proper, saying, 300 U.S. at page 552, 57 S.Ct. at page 601:

"More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

In answer to the contention that the Norris-LaGuardia act controlled, the court said, 300 U.S. at page 563, 57 S.Ct. at page 607:

"It suffices to say that the Norris-LaGuardia Act can affect the present decree only so far as its provisions are found not to conflict with those of section 2, Ninth, of the Railway Labor Act (45 U.S.C.A. § 152, subd. 9), authorizing the relief which has been granted. Such provisions cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act."

Insofar as the Railway Labor Act, as we now interpret it, authorizes the issuance of injunctions to prevent strikes over minor disputes, it operates to repeal the provisions of the Norris-LaGuardia act, to the extent that the wording thereof might otherwise be said to apply to such railway labor disputes. It follows that, in the case at bar, the district court has jurisdiction to entertain plaintiffs' prayer for injunctive relief.

3. The correctness of the conclusions which we have reached in this case is supported by the legislative history of the Railway Labor Act.[9]

For the reasons herein set forth, the order from which an appeal has been taken is reversed and the cause is remanded to the district court with instructions to take further proceedings not inconsistent with the views herein expressed.

---

9. See: statement of Mr. Harrison, ante page 5 [930 p. of 229 F.2d]; Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, at pages 721–729, 65 S.Ct. 1282, 89 L.Ed. 1886; hearings before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. (1934) on S. 3266; hearings before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. (1934) on H. R. 7650; Senate Report No. 1065 (73d Cong., 2d Sess.); House Report No. 1944 (73d Cong., 2d Sess.) and 78 Cong.Rec. 11710–11720, 12083, 12375.