FLIGHT ENGINEERS' INTERNATIONAL ASSOCIATION, AFL-CIO,
et al., Appellants,

v.

AMERICAN AIRLINES, INC., Appellee.

No. 19055.

United States Court of Appeals
Fifth Circuit.

June 7, 1962.

Charles J. Morris, Dallas, Tex., I. J. Gromfine, Washington, D. C., Mullinax, Wells, Morris & Mauzy, Dallas, Tex., Zimring, Gromfine & Sternstein, Washington, D. C., for appellants.

Raymond E. Buck, Fort Worth, Tex., Arthur M. Wisehart, New York City, Buck & Buck, Fort Worth, Tex., for appellee.

Before BROWN, WISDOM, and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Jets are not only speedy. They provoke problems with the further question whether such problems may translate themselves for solution into a form within the capability of the slower moving machinery of the law. Here we are not dealing with physical forces unleashed by these scientific supersonic advances. We deal, rather, with more elemental tensions—those growing out of the ancient relationship of master and servant and, as one phase, a jungle-like internecine struggle when members of one union feared destruction of their jobs as another union was to undertake to represent their interests. In this mix-

ture of the old and the new, the legal controversy centers around the availability of another ancient mechanism—the equity injunction—to enforce compliance with the statute enacted initially to cover railroad employees, on the one hand, and on the other, the prohibitory effect of a statute enacted to keep federal courts out of labor relations via the injunctive power.

What started as a nice, neat question of bargainability and the collateral problem of the extent to which an employer could enjoin a strike threatened to compel bargaining of issues not open to bargaining, ran into considerable turbulence. A strike was not only threatened, it was called and executed. The parties are, however, in considerable dispute whether this was a strike over the matters presented initially in the case, or was, to the contrary, a wildcat manifestation as to this air Carrier of a nationwide protest against a decision—of all things—of the National Mediation Board which had held that the pilot's union was the proper bargaining agent for all personnel on the flight deck of jets including Flight Engineers. Though it had not yet ruled on the underlying matter which precipitated the filing of this suit by the Carrier,[1] and determination of these matters had been deferred under a no strike pledge by attorneys for the union,[2] the District Court had to divert its attention from the main controversy to the new one of the sudden strike. After a prolonged hearing on this phase, a preliminary injunction was issued against the Flight Engineer's Union and its members forbidding the current, or any other, strike pending determination of the main case. It is from that preliminary injunction that the Union has appealed. 28 U.S.C.A. § 1292(a) (1).

Briefly, this is the background to this appeal. A five-year agreement between the Carrier and the Flight Engineers' Union became effective May 1, 1958. A supplemental agreement relating to turbo-jet or prop-jet aircraft became effective the same day. It provided that written notice of an intended change in any provision could be served 30 days after the first anniversary date of the first turbine aircraft in scheduled passenger service. These agreements also established a System Board of Adjustment, and provided for finality of its decisions.

On January 25, 1960, within the year and 30-day period, the Union gave notice of its intention to change certain provisions in the supplement agreement. But the Carrier took the position that a number of these demands were actually covered by the terms of the basic agreement, and therefore not open for bargaining for 5 years. As negotiations were bogged down over this dispute, the Union in July 1960 invoked the services of the National Mediation Board. But the Board, on November 17, 1960, recessed the case pending determination by a "competent tribunal" of the controversy whether all of the issues presented were properly open. The Carrier then presented the controversy to the System Board of Adjustment, but the Union refused to participate on the ground that the dispute was a "major dispute" and therefore outside the jurisdiction of the System Board of Adjustment. The Carrier then instituted suit in the District Court seeking a ruling that the System Board of Adjustment had jurisdiction. The Court, on January 16, 1961, at the completion of an extended hearing, suggested that further efforts be made to resolve the dispute, and reset the hearing for a later time. The Union then asked the National Mediation Board to reconsider its decision to recess mediation, but the Board again refused on February 7, 1961. The Carrier again sought determination by the System Board of Adjustment, but the Union again declined to participate.

The date for the adjourned hearing had been successively extended by mutual

---

1. American Airlines, Inc.

2. Flight Engineers' International Association, AFL–CIO, American Airlines Chapter.

consent to Saturday, February 18, 1961. A few days before that date, the parties by a signed stipulation agreed to a further indefinite postponement pending decision of the suit by the Union against the National Mediation Board then being instituted in the United States District Court for the District of Columbia. Out of the blue, about 11:00 p. m. on Friday, February 17, the Flight Engineers declined to fly. What was sweetness and light under the stipulation for indefinite postponement now changed into acrimonious and emotional charges and counter charges. A hurried hearing was precipitated, and the Judge granted a restraining order on February 18. After further hearings the strike was enjoined by the preliminary injunction of February 21, 1961, now under review.

The parties—this is especially true of the Union—are so preoccupied with the sudden strike and the injunction against it, that the underlying main controversy is almost completely forgotten.

We think it important to keep both quite distinct. Doing so, we are of the view that insofar as the injunction forbids that strike of February 17–21, 1961, the controversy is moot. Consequently, we need not examine closely the asserted errors leading up to, or resulting in, that injunction.[3]

■ ■ One of the errors was the refusal of the trial Judge to allow the Union by cross examination and evidence to establish the real cause of the sudden work stoppage of February 17, 1961. The Court, even under the restricted time limitation of the hearing for preliminary injunction, ought to have allowed this evidence. But no harm was done, for enough of it got in that, together with subsequent actions of which

we can take judicial notice, it is certain that this strike was a part of a nationwide work stoppage by which the Flight Engineers' Union and its members used economic pressure directed against employers to protest a decision of a federal governmental agency. This decision, broadly stated, was that the Pilots' Union[4] was the proper bargaining agent for all flight deck personnel, including Flight Engineers. This terrorized Flight Engineers because of the vigorous advocacy by the Pilots' Union of the demands that all Flight Engineers have pilot qualifications. Paraphrasing Judge Hutcheson, this was, they thought, to "first ground the engineers and then drive them from the air lanes altogether." Brotherhood of Locomotive Firemen, etc. v. Mitchell, 5 Cir., 1951, 190 F.2d 308 at 312.

Without passing upon the public or private morality of it, the Union strategy was simple but effective: simultaneous strikes against all major air carriers would paralyze the nation's transportation bringing about public indignation and likely interference by higher governmental forces, and thus effectually nullify the quasi-judicial decision of a supposedly independent agency, the National Mediation Board. This is exactly what happened. The work stoppage began on February 17. On February 21, Secretary of Labor Goldberg issued his statement. It recommended that the President appoint a public commission serving as an adjunct to the Railway Labor Act to solve this troublesome problem of performance of the flight engineer function on jets. It urged all Flight Engineers to return to work immediately in view of the pledge obtained by the Secretary of Labor from all struck carriers that they would engage in no re-

3. On a showing of mootness, the order under attack is ordinarily vacated to that extent. See, e. g., Central of Georgia Railway Co. v. Brotherhood of Railroad Trainmen, Local Lodge No. 721, 1957, 352 U.S. 995, 77 S.Ct. 554, 1 L.Ed.2d 540, dismissing as moot an injunction against a strike (reversed earlier by us, 229 F.2d 901), but substantially approved

in a parallel case from the 7th Circuit, 229 F.2d 926, in Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 33, n. 3, 77 S.Ct. 635, 1 L.Ed.2d 622.

4. The Airline Pilots' Association, commonly referred to as ALPA likewise a constituent member of AFL–CIO.

prisals against the men for having walked out. The President, by Executive Order 10921, on February 21, 1961, appointed a Commission "to consider differences that have arisen regarding the performance of the flight engineer's function, the job security of employees performing such function, and related representation rights of the unions, namely, the Flight Engineers International Association and the Air Line Pilots Association * * *." U.S.Code Cong. & Admin. News 1961, p. 1272.

The men shortly returned to work. Flights were resumed. And it is fair to state—as this record demonstrates vividly, but mutely—this resulted from the executive intervention and not by reason of the restraining order of Saturday, February 18, or the preliminary injunction issued on February 21, 1961, each of which was completely ineffective to bring the men back to work during the time the hearing was being conducted on Monday and Tuesday, February 20–21. The sequel is, of course, that the Commission made its first report on May 24, 1961. This was followed by its supplemental report of October 17, 1961.

■ We do not know whether the compromises proposed were accepted, nor is this of any judicial concern to us. What is important, and why we have spelled out developments in detail, is that the actual cause of the sudden walkout no longer exists. So far as that incident is concerned, the preliminary injunction, although actually ineffective,[5] has served its full purpose. Whether it was proper or improper, the question is now moot.

But since the injunction forbids any and all work stoppages pending determination of the main controversy, we must examine its validity apart from this wildcat February strike.

The main controversy may be stated in broad terms with a consequent likelihood of some technical inaccuracy. As briefly reviewed above, the supplemental agreement covering certain matters as to jets had a one-year reopen clause. Within that one-year period, the union on January 25, 1960, made its written demands for a great number of changes in the labor contract between the Carrier and the Union. It is not claimed that the proposed changes involved here came within that reopen privilege. That demand is what ultimately precipitated this lawsuit.

■ The parties are in substantial accord that one purpose of the supplemental agreement (executed simultaneously with the basic agreement) was to "lock-in" for a period of one year those Flight Engineers who had taken turbo or prop-jet training. The Carrier required this because, in the absence of it, a Flight Engineer upon completion of expensive training for jets might choose to exercise a seniority right to bid for other flights of piston-powered planes. Consequently, the supplemental agreement undertook to spell out the provisions concerning the obligation to serve on jets after training, and the like.

But the demands by the Union of January 25, 1960, were not confined to those matters covered by the supplemental agreement. The Carrier declined to bargain on these numerous items which were not open under the reopen clauses. As the parties made no progress in the discussion, the Union, under the Railway Labor Act, 45 U.S.C.A. § 155, First, referred the matter to the National Mediation Board. Before the Board, the Carrier renewed its contentions that by virtue of the labor contract, the items on which it declined to

5. See Flight Engineers International Association, EAL Chapter v. Eastern Airlines, 5 Cir., 1962, 301 F.2d 756, in which we reversed a $25,000 fine against this Union for refusal to obey a similar injunction growing out of this same dispute. Reversal was on the sole ground that the case was improperly tried as a civil, rather than a criminal, contempt. The contempt order under review emanated from the District Judge's view that the agreement made by the Airlines with the Secretary of Labor did not affect the obligation of the Union and its members to obey the injunction or prevent the effective punishment to vindicate the orders of the Court.

bargain were not open for bargaining. On November 17, 1960, the Board declared that the "controversy whether" these union demands may be asserted at this time should be "submitted to a competent tribunal for an immediate final and binding determination." This was required, so the Board said, because "unless and until such a determination is made, * * * the vital intents and purposes of the [Railway Labor] law are defeated * * *." The Board, therefore, ordered that "the case is hereby recessed." [6] Within a week of the National Mediation Board recessing order the Carrier on November 22, 1960, sought to submit the dispute to the System Board of Adjustment.

On November 29, 1960, the Union replying to the Board's November 17 recess order insisted that under § 5, First, of the Railway Labor Act, 45 U.S.C.A. § 155, First, if the Mediation Board could not effect a settlement by mediation, it had only one course of action and must "at once endeavor * * * to induce the parties to submit [the dispute] to arbitration," failing that, it must declare "that its mediatory efforts have failed." This the Carrier treated—and justifiably so—as a threat that this was the equivalent of a failure of mediation which would set in motion the statutory 30-day cooling off period, § 5, First, 45 U.S.C.A. § 155, First, preceding action by a Presidential Emergency Board, if appointed under § 10, 45 U.S.C.A. § 160, after which the Union would be entitled to strike.

It was at this stage that the lawsuit was filed on December 16, 1960. The Carrier asserted that since there was a controversy as to whether, under the contract, the demands of the Union were open for bargaining, this presented a question as to the "interpretation or application of agreements," (45 U.S.C.A. § 153, First, (i)) and that this was, therefore, a question for decision by the System Board of Adjustment. The failure and refusal of the Union to submit the controversy to the Board of Adjustment was a refusal to comply with the Railway Labor Act. Consequently, the Carrier alleged, the persistent claim of the right to strike—amounting to a threat of a strike—should be enjoined pending determination of the main question of the bargainability of the demands. It also sought a declaration of rights and determination of the basic question by the Court as the "competent tribunal," in the words of the National Mediation Board, if it were concluded that the System Board of Adjustment was not such tribunal.

The District Court held a hearing on January 11, 1961. Several things bear comment concerning it. There was, first, not even a breath of fear that a wildcat strike would soon occur within a month's time. Next, the Judge showed great restraint in not allowing a Court to get in the middle of labor contract negotiations or settlement. It reflected this by its interim order of January 16, 1961. The case was adjourned to a fixed date (later extended by agreement) to report the progress being made toward settlement. The Court outlined four steps toward settlement which the parties should take. One was a renewed effort to get the National Mediation Board to hear the case. Another was to submit this controversy to a System Board of Adjustment. When the wildcat stoppage of February 17 brought about the hearing of February 18, the record soon developed that (a) the National Mediation Board adhered to its earlier order recessing the case pending determination of the controversy by a "competent tribunal" and (b) the Union had declined to join or participate in any way in a determination of this controversy by a System Board of Adjustment.

Thus, the proof showed the existence of a very real, serious, and perhaps difficult controversy. It showed also that

6. The correctness of the National Mediation Board's recessing order was challenged directly by the Union in March 1961 in the District Court for the District of Columbia. On October 11, 1961, that District Court reciting all of the developments, including the action in the Texas District Court here under review, denied a request for preliminary injunction against the National Mediation Board.

the Union was tenacious in its persistent claim that the Union was right and the Carrier was wrong. So long as it adhered to this position—to which incidentally it still clings—the consequence was equally plain. The Union was claiming the right to strike to force bargaining. The Court and the Carrier were each entitled to take the Union at its word. The gage was thrown: bargain or suffer a strike. But if—and we neither minimize nor expand the if—the Carrier was right on the law, a strike would be direct violation of those provisions of the Railway Labor Act compelling submission of disputes to the statutory agencies. In that situation, the Union would not be permitted to resort to that uniquely unlawful self-help.

■■ What is a Court to do under such circumstances? Must it act immediately and finally? Or may it not preserve the status quo pending a judicious, calm and orderly judicial determination of this justiciable problem? That is the classic office of a preliminary injunction. So much so is it that on review of such an interlocutory order, we do not examine into the merits as such. The probable merits are looked to only insofar as they bear on the question whether the trial Court abused its discretion in granting interim relief. Barnwell Drilling Co., Inc. v. Sun Oil Co., 5 Cir., 1962, 300 F.2d 298; Dronet v. Tucker, 5 Cir., 1962, 300 F.2d 559; Detroit Football Co. v. Robinson, 5 Cir., 1960, 283 F.2d 657; Miami Beach Federal Savings & Loan Ass'n v. Callander, 5 Cir., 1958, 256 F.2d 410.

■ Here there was an added factor making it essential that the position be maintained until this basic legal question was resolved. The trial Judge simultaneously reached the conclusion that the Carrier "has made a substantial showing that the Adjustment Board is the proper tribunal to hear the controversy * * *." But while the Court could determine for itself that that agency had both jurisdiction and power to adjudicate this cause, the working of this statutory scheme requires that the jurisdiction of that agency be first determined by it.

Baltimore & Ohio R. Co. v. United Railroad Workers, 2 Cir., 1959, 271 F.2d 87, 91, vacated and remanded on other grounds, 364 U.S. 278, 80 S.Ct. 1609, 4 L.Ed.2d 1719.

This was especially important since the Union's position, then and now, is that under the basic labor contract only the employees, not the Carrier, can invoke the System Board of Adjustment. Again, without undertaking to anticipate what the decision on that score must be, we agree with the implied conclusion of the trial Judge that the likelihood of the System Board of Adjustment having jurisdiction over a claim of this kind at the request of the Carrier was substantial enough to warrant submission of the whole controversy (including that threshold question) to the System Board of Adjustment. And, without imputing to the Union any concession that an injunction would then be an available mechanism, the parties seem to be in substantial agreement that if (a) the National Mediation Board is correct in declining mediation pending authoritative determination of this basic question, and (b) the System Board of Adjustment declares that it is *not* such a tribunal or can not otherwise adjudicate the issue, then (c) the District Court m̀ust be such a tribunal. But whether the Court must ultimately adjudicate the basic issue requires, as we have explained above, an orderly exhaustion of the primary jurisdiction of the statutory agency. In addition, once any such decision is reached by the System Board of Adjustment, the Court to whom the problem would then return must have both time and circumstances under which to reflect upon the proper decision. This latter would inevitably require detailed consideration of evidence by the Court on the nature of the Union's bargaining demands in contrast to, and as measured against, the great number of details concerning turbine operations as set forth in the basic agreement or supplemental agreement of 1958, or both. That, too, would take time both to receive and assimilate.

Everything combined to point unerringly to the need for time. What were

the choices then? If no injunction was issued, the Union would be free to strike. This would prejudge the issue at stake, or, more likely, finally render it all moot. In the meantime, the Carrier's interest would be affected. But more so, the public interest reflected by congressional purpose to provide orderly conciliation and adjustment machinery would be severely jeopardized. If, on the other hand, the status quo was maintained by a preliminary injunction, a subsequent determination in the Union's favor would leave it free to strike to enhance its then established right to demand bargaining for items outside the scope of the reopening clause. Indeed, the right to do it, and the right to threaten the strike, would likely produce agreement and thus eliminate a strike altogether.

■ Of course, all of this analysis on competing factors inherent in the question to grant or deny a preliminary injunction to preserve the status quo must be read in the light of the Norris-LaGuardia Act, 29 U.S.C.A. § 107. To this extent review by us involves so much of the merits as to determine whether there was a probable substantial basis for concluding that this controversy was outside the pale of that Act.

■ We think it adequately passes muster on this score. Whether the new demands were outside the scope of the reopen clause involved two questions. First, there was the dispute over the meaning and interpretation of that contract as a written document. Second, there was the question of law whether on either interpretation of the contract, the Union could, or could not, compel bargaining. These questions, singly or collectively, all arose out of and pertained to the existing contract, and the nature and extent of its legal effectiveness.

That, of course, is the classic "minor" dispute as that misnomer has come to be understood in federal labor relations matters. Elgin J. & E. R. Co. v. Burley, 1945, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886; Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 1960, 362 U.S. 330, 341, 80 S.Ct. 761, 4 L.Ed. 2d 774.

■ When the controversy is a "minor dispute," it is now clear that despite the literal words of the Norris-LaGuardia Act a Federal Court does have the power—and should exercise it—to enjoin strikes or other actions until the determination of pending controversies by the grievance machinery of the Board of Adjustment. This the Supreme Court recognized plainly by its decision in the Chicago River case.[7] The Court's approach was summed up this way. "There must be an accommodation of [the Norris-LaGuardia] and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable." 353 U.S. 30 at 40, 77 S. Ct. 635 at 640.

The Union fails in its strenuous efforts to convince us that the Chicago River case became a dead letter just 3 years later with the pronouncement by the Court in the Telegraphers case.[8] Its very holding was reaffirmed in positive words in that very same case. "We have held that a strike over a 'minor dispute' may be enjoined in order to enforce compliance with the Railway Labor Act's requirement that minor disputes be heard by the Adjustment Board. Brotherhood of Railroad Trainmen v. Chicago River & I. R. Co., [1957], 353 U.S. 30 [77 S.Ct. 635, 1 L.Ed. 622]. * * *" 362 U.S. 330, 341, 80 S.Ct. 761, 767. And this was reiterated shortly thereafter in that same term (1960) in the Katy case.[9] Concerning the power of

7. Brotherhood of Railroad Trainmen v. Chicago River & Indiana Ry. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.

8. Telegraphers v. Chicago & Northwestern Ry. Co., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774.

9. Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co., 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379.

the Court to enjoin a strike over matters pending before the Adjustment Board, the Supreme Court " * * * concluded that such an injunction does not fall within the prohibitions of the Norris-LaGuardia Act * * * because of the superseding purpose of the Railway Labor Act to establish a system of compulsory arbitration for this type of dispute, a purpose which might be frustrated if strikes could not be enjoined during the consideration of such a dispute by the Board." 363 U.S. 528, 531, 80 S.Ct. 1326, 1328. Moreover, the Telegraphers case was in no sense a "minor dispute." The Union sought to bargain on a matter not then covered, and as to which no provision of the existing contract either forbade or restricted the demand or the right to make demand.

Again, without anticipating what the decision of the System Board of Adjustment on the merits (assuming it has jurisdiction) must be, this analysis rests on the premise that the law as such will give vitality to the duration clauses and correlative reopening clauses of labor contracts. The Union argues in effect that since no one in 1958 knew all of the

problems which would arise in the operation of jets, the Union could not foreclose its statutory right—and duty—to bargain when, and as, and as often as needed.[10] But any such rule leads either to chaos or a demolition of the concept of industrial peace through labor contracts fairly arrived at.

■ Thus it substantially appears that on the final hearing, it will be determined that this is, and has been, a minor dispute which must be submitted to the Board of Adjustment as repeatedly sought by the Carrier. If that transpires, then the preliminary injunction was indeed proper as that conclusion will almost necessarily compel a similar permanent injunction. That the hearing may ultimately result in the contrary decision does not deprive the District Court of its power to grant interim preliminary relief to enable that serious judicial controversy to be settled in an orderly fashion. In that light, no abuse of discretion was demonstrated and the issuance of the preliminary injunction was proper insofar as strikes or other self-help pertained to this main controversy.[11]

Affirmed.

10. The Union urges § 2, First; § 2, Second; § 2, Fourth; § 2, Seventh; and § 2, Ninth of the Railway Labor Act, 45 U.S. C.A. § 152, on the duty to bargain collectively; also cases dealing with the general obligations under the Act to bargain: Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 547, 57 S.Ct. 592, 81 L.Ed. 789; Order of R. Telegraphers v. Railway Express Agency, 1944, 321 U.S. 342, 346, 64 S.Ct. 582, 88 L.Ed. 788; Elgin Joliet & Eastern R. Co. v. Burley, 1945, 325 U.S. 711, 721, 65 S.Ct. 1282, 89 L.Ed. 1886; also some cases arising under the Labor Management Relations Act, 29 U.S.C.A. § 151 et seq., which the Supreme Court in Steele v. Louisville & N. R. Co., 1944, 323 U.S. 192, 200, 65 S.Ct. 226, 89 L.Ed. 173, treated as a duty to bargain under statutes having like provisions, such as Brotherhood of Railway & Steamship Clerks, etc. v. Atlantic Coast Line R. Co., 4 Cir., 1953, 201 F.2d 36, cert. den., 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400, relying upon N. L. R. B. v. Berkley Machine W. & F. Co., 4 Cir., 1951, 189 F.2d 904;

Great Southern Trucking Co. v. N. L. R. B., 4 Cir., 1942, 127 F.2d 180; Aluminum Ore Co. v. N. L. R. B., 3 Cir., 1942, 131 F.2d 485, 147 A.L.R. 1; Globe Cotton Mills v. N. L. R. B., 5 Cir., 1939, 103 F.2d 91; N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 1940, 110 F.2d 632.

11. It is, of course, vacated as moot insofar as it bears upon or relates to the incident of February 17–21, 1961.

The broad terms of the order enjoining such acts as "any picketing * * * strike, * * * work stoppage * * * or refusal to act as Flight Engineer * * * or any other act of economic coercion * * *" or in "any manner interfering with * * * any person * * * in performing his work * * *" or in "any manner interfering with * * * the * * * continuance of" service by the carrier, and the like, are to be restricted in their application to the main controversy involved in the suit. The order does not curtail the Union or its members as to controversies not related to it.