SEABOARD WORLD AIRLINES, INC.,
Plaintiff-Appellee,

v.

TRANSPORT WORKERS UNION OF
AMERICA, AFL–CIO, et al.,
Defendants-Appellants.

No. 525, Docket 34337.

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1970.

Decided March 23, 1970.

Asher W. Schwartz, New York City (O'Donnell & Schwartz, New York City, of counsel), for defendants-appellants.

Arthur Mermin, New York City (Cahill, Gordon, Sonnett, Reindel & Ohl, Henry C. Bisgaier, and Laurence T. Sorkin, New York City, of counsel), for plaintiff-appellee.

Daniel Kornblum, New York City, amicus curiae, submitted brief for the "Non-Protected" Flight Navigators.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from a temporary injunction against an airline navigators' strike issued by the District Court for the Eastern District of New York concerns a collective bargaining agreement and a supplemental security agreement made in October 1964 between Seaboard World Airlines, Inc., and its flight navigators represented by the Transport Workers Union. Lurking behind the agreement, which, as will later be seen, had some unusual terms, was the prospect that an electronic device, colloquially called a "black box," would permit the elimination of navigators by the end of the decade. After an abortive attempt to resolve this question in 1961, Seaboard and the Union turned to it again in protracted negotiations in 1963 and 1964 and ultimately reached agreement. The displacement clauses, embodied in the supplemental security agreement, provided that displacement should occur only on jet aircraft and that displaced navigators should receive a variety of benefits including "synthetic" flight time, white-collar ground positions, pensions, and, in case of lay-off, severance allowances. These benefits accrued, however, only to 27 navigators whose initial date of employment (1951 or earlier) long preceded the "black box"; five navigators employed in 1964 and any future hires were excluded. In light of all this, the job protection provision of the collective bargaining agreement was limited to routes "where governmental regulations require a member of the crew complement to hold a Flight Navigator's certificate," a requirement that does not now exist once an FAA-approved automatic navigational device is installed on Seaboard's present aircraft.

The unusual features of the collective bargaining agreement were Article 25—Complete Settlement and Article 29—Duration. These read:

Article 25—Complete Settlement

(A) By the making of this Agreement, the Company and the Union have settled all existing disputes and issues between them and have provided a method for the settlement of issues and disputes arising under this Agreement, and the Union expressly states that, except as provided by Paragraph (A) of Article 27, it will not, during the term of this Agreement, have the right to insist upon collective bargaining as to any member whether or not such matters are dealt with in this Agreement. This Agreement may be modified only by written mutual agreement executed by the Company and the Union.

Article 29—Duration

This Agreement shall become effective as of the date of signing except that Article 3—Compensation, Paragraph (B)2(a) and (e) and Article 12 —Sick Leave shall be effective as of July 1, 1964 and except that Article 4 —Hours of Service, Paragraph (D)2 shall be effective October 1, 1964. This Agreement is recognized by the parties as a permanent solution to all matters which are, or which could have

been contained therein. Accordingly, it shall have a permanent duration and may not be altered without the written consent of both parties. Notwithstanding the above, on July 1, 1974, this Agreement may be reopened solely with respect to the subject matter and content of Article 3—Compensation— upon serving of written notice of intended change in accordance with Section 6—Title 1 of the Railway Labor Act, as amended, by either party thereto.

The severity of this was somewhat tempered by a 50 cents per hour automatic wage increase on July 1, 1967, and a provision, Article 18(M), that when a new type of aircraft was placed in operation either Seaboard or the Union could initiate negotiations on rates of pay, rules and working conditions. With the introduction of jets, increased wage rates were agreed pursuant to this provision on July 1, 1968, with a second set of increases becoming effective January 1, 1969. The agreement contained a conventional no-strike clause.

All might have been well if, as the parties anticipated in 1964, the navigators had been phased out during the next few years. However, Seaboard's operations increased in 1965 and 1966 because of trans-Pacific flights occasioned by the war in Vietnam. Instead of eliminating navigators, Seaboard had to hire 57 additional ones—6 in 1965, 13 in 1966, 19 in 1968, and 19 in 1969. All but the first 13 of these signed letters acknowledging that they were fully aware of the short-range nature of their jobs.

In 1969 the Union requested security benefits for navigators other than the 27 who were protected under the 1964 agreements. Being dissatisfied with Seaboard's offers, it wrote a letter on October 14, 1969, seeking to reopen the entire 1964 agreement under § 6 of the Railway Labor Act. Seaboard responded by a letter asserting that a reopener was barred by the "clear language" of the two provisions quoted above, invoking arbitration under Article 21 of the agreement establishing a System Board of Adjustment in compliance with § 204 of the Railway Labor Act,[1] and announcing its readiness to continue discussions of security for the unprotected navigators on a voluntary basis. The Union reacted with a telegram contending that the letter constituted a denial of the navigators' rights under § 6 and advising that they had voted to strike on November 13, 1969, unless Seaboard acknowledged its obligation to bargain. This suit by Seaboard for temporary and final injunctive relief followed. The Union cross-moved for an order directing Seaboard to bargain.

Despite Seaboard's invocation of arbitration, there was no real dispute that the agreement prohibited a reopener in 1969. The Union's position was rather that a collective bargaining agreement "of permanent duration" is illegal. Seaboard's replies were a denial of illegality, at least under the special circumstances that had led to the agreement here at issue, and an assertion that, if there were any illegality, the only permissible reopener would be with respect to the term.[2] The district judge intro-

---

1. The language of the contract is a shade different from that of the statute. Article 21(D) says:

> (D) The Board shall have jurisdiction over disputes between any employee covered by this Agreement and the Company growing out of grievances or arising out of the interpretation or application of any of the terms of this Agreement. The jurisdiction of the Board shall not extend to proposed changes in hours of employment, rates of compensation or working conditions

covered by existing agreements between the parties hereto.

2. This was asserted by virtue of a "savings clause" which read:

> (A) Should any term of provision of this Agreement be rendered invalid by reason of any existing or subsequently enacted legislation or by reason of any regulation or decision of any state or federal regulatory agency or court having jurisdiction, such invalidation shall not affect the remaining terms and

duced a new element into the case. He thought that the duration article was ambiguous since "something may in varying contexts indeed be permanent without being eternal or everlasting."[3] There was thus, in his view a dispute "between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions" requiring determination by the System Board of Adjustment, 45 U.S.C. § 184, and "it will not be known until the Adjustment board interprets the 1964 agreement whether that board is to assume jurisdiction over a minor dispute or whether the Mediation board major dispute processes are instead to be invoked." Accordingly he granted a temporary injunction for a period deemed sufficient "for resolution of the liminal issue of Adjustment board jurisdiction," with leave to either party to move for a change in its terms. The Union appeals from this as well as from a denial of its cross-motion which was "marked off as presently premature, subject to restoration by defendants if and when unfolding events considered in the context of the foregoing opinion make such restoration appropriate."

■■ The Supreme Court instructed in Elgin, Joliet & Eastern R.R. v. Burley, 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), adhered to, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946), that "The difference between disputes over grievances and disputes concerning the making of collective agreements is traditional in railway labor affairs." The difference, reaffirmed when Congress made the Railway Labor Act applicable to airlines, 49 Stat. 1189, 45 U.S.C. §§ 181–188, exists with respect not only to the initial making of collective agreements but also to efforts to change them, 45 U.S.C. § 156. For the first category the statute, broadly speaking, prescribes an arbitral process with boards of adjustment composed of equal numbers of management and labor and with the Mediation Board to name a referee in the event of deadlock. Awards of such boards are "final and binding upon both parties to the dispute," 45 U.S.C. § 153(m), and, despite the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, an injunction may issue against a strike growing out of such a dispute. Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). A quite different course is prescribed for "a dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference" and "any other dispute not referable to [an adjustment board] and not adjusted in conference between the parties or where conferences are refused," 45 U.S.C. § 155. In such cases, again speaking broadly, the Mediation Board is to use its best efforts to bring the parties to an agreement or, if these fail, to induce them to submit to arbitration. If this also fails, no change shall be made in rates of pay, rules, or working conditions or established practices for 30 days and, if within that period an emergency board is created, for 30 days after its report. 45 U.S.C. §§ 155, 156, 160. After all this is over, the parties may resort to self-help. Brotherhood of Locomotive Engi-

---

provision of this Agreement which shall remain in full force and effect.

(B) In the event of such invalidation, either the Company or the Union may, upon thirty (30) days' written notice, request negotiations concerning modification of amendment of the invalidated provision or provisions, and such negotiations shall commence within fifteen (15) days from the date of receipt of said notice. If the parties are unable to reach agreement in such negotiations, the issue or issues handled [sic] as prescribed by Article 22—"Adjustment Board" hereof.

3. The judge explained: "The solution, in short, was only ad hoc and the durational term ambiguous and hence, indefinite, but possibly by some circumlocutions definable, as are other amphibolies in law."

neers v. Baltimore & Ohio R.R., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express and Station Employees, A.F.L.-C.I.O. v. Florida East Coast Ry., 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966).

■■ The statute does not speak with complete clarity on whether a claim by one party that an attempt by the other to initiate a "change in agreements affecting rates of pay, rules, or working conditions" is forbidden by the terms of the agreement, 45 U.S.C. §§ 152 Seventh and 156, falls within one procedure or the other. Such a dispute comes within the letter both of the Adjustment Board provisions, 45 U.S.C. §§ 153 First (i) and 184, and of the Mediation Board provision, 45 U.S.C. § 155. Considerable support for the view that the question must go to the Adjustment Board where there is a dispute over interpretation, is furnished by Order of Railway Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946), although the precise issue there was whether there had been a "change in agreements" requiring the carrier to comply with § 6. In Flight Engineers' Int'l Ass'n, A.F.L.-C.I.O. v. American Airlines, Inc., 303 F.2d 5, 11 (5 Cir. 1962), the court held that the likelihood that a board of adjustment would consider itself to have jurisdiction over such a dispute "was substantial enough to warrant submission of the whole controversy (including that threshold question)" to it and to enjoin a strike pending the board's decision. See also Roberts v. Lehigh & New England Ry., 323 F.2d 219 (3 Cir. 1963); Southern Ry. Co. v. Brotherhood of Locomotive Firemen, 119 U.S.App.D.C. 91, 337 F.2d 127 (D.C.Cir. 1964).

On the other hand we are unable to see that any relevant question of interpretation exists in this case. Whatever "permanent" may mean, the agreement is utterly plain that no reopening of any kind is permitted prior to July 1, 1974, and only with respect to compensation then. While there may be a question whether reopening on other matters is banned only for a reasonable time beyond July 1, 1974, or forever, it is too clear for argument that the agreement forbids a reopener on security matters in 1969.[4] The Union states its representatives on the board of adjustment would agree that the terms of the contract forbid such a reopening now and the company representatives will hardly claim the opposite. The Supreme Court has said, although admittedly in a somewhat different context, that where there is "no question of interpretation or application of the collective agreement, but rather only one of its validity under the statute, the case is not one in which resort to the grievance and Adjustment Board machinery provided by the Railway Labor Act was required." Felter v. Southern Pacific Co., 359 U.S. 326, 327–328, 79 S.Ct. 847, 850, 3 L.Ed.2d 854 n. 3 (1959). While the duration of the prohibition on reopening after 1974 may have some bearing on the claim of illegality, the real question will be whether the Act permits an employer and a union who expect all jobs to be eliminated in a fairly short time to make a contract good until that event occurs, despite the possibility, here realized in some degree, that their expectations may prove to be wrong, and we should hardly think it would be very material just how much longer than ten years the agreement was to endure. In any event we do not read the Railway Labor Act as providing for arbitration where the board of adjustment could only render something in the nature of an advisory opinion that might assist a court in deciding an issue of legality confided to it, rather than a "final and binding" award as to what the parties may or may not do at the present time. We thus cannot sustain so much of the injunction as

4. Seaboard contends that all the navigators will have been displaced long before 1974 and that the Union's present interest is in getting security benefits for the unprotected navigators while it still has some economic muscle; the Union answers it has heard such predictions before.

directs a reference to a board of adjustment.

■ On the other hand the question of the legality of the long prohibition on reopening in the contract between Seaboard and the Union is important and should be determined in the first instance by the district court.[5] We thus reach the issue whether, consistently with the Norris-LaGuardia Act, 29 U.S.C. § 101 ff., a federal court may enjoin a strike prohibited by an airline collective bargaining agreement until the legality of the prohibition can be determined by it. If the question arose with respect to a collective bargaining agreement in an industry affecting commerce other than one subject to the Railway Labor Act, Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), would dictate a negative answer. However, the *Sinclair* opinion recognized that a different conclusion might be warranted in a case arising under the Railway Labor Act. Referring to the *Chicago River* decision, *supra*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, Mr. Justice Black said the Court was there "dealing with a statute that had a far different legislative history than the one now before us." 370 U.S. at 211, 82 S.Ct. at 1337. He went on to say "there was no indication in the legislative history of § 301 [of the Taft-Hartley Act], that Congress had after full debate and careful consideration by both Houses and in Joint Conference specifically rejected proposals to make the prohibitions of the Norris-LaGuardia Act inapplicable," and called attention to the statement in *Chicago River*, 353 U.S. at 31, 77 S.Ct. at 636 n. 2:

> The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are not the same as those which form the basis of the National Labor Relations Act * * *.

In Chicago, Rock Island & P. R.R. v. Switchmen's Union, 2 Cir., 292 F.2d 61, 66 (1961), cert. denied 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962), we concluded that, despite the Norris-LaGuardia Act, an anti-strike injunction could be issued in some preliminary stages of "major disputes." We instanced a threatened strike after the creation of an emergency board and for thirty days after the board had reported to the President, § 10, or during the thirty day period after the Mediation Board had notified the parties that its efforts had failed, § 5 First. We thought that "Slightly further along in the spectrum would be a threatened strike at an earlier date and hence not within either specific prohibition but, at least arguably, impliedly prohibited by the general scheme of the Railway Labor Act and §§ 2 First and Second, 5, 6 and 10."

Even further along in the spectrum but still, we think, withdrawn from the prohibitions of the Norris–LaGuardia Act is a strike in support of a § 6 notice which is forbidden by the collective bargaining agreement unless the prohibition is invalid. Section 2 First makes it "the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." If the agreement between Seaboard and the Union had prohibited the giving of a § 6 notice for a year, the Union gave one a month after the contract was signed, Seaboard refused to honor it and the Union threatened a strike, it is hard to believe that the

---

5. While there would be no legal barrier to our deciding that issue, the parties suggest that the record made on Seaboard's mo-tion for a preliminary injunction and the Union's cross-motion may not contain all the factual material that will be useful.

necessary accommodation of the Norris-LaGuardia Act, and the Railway Labor Act, see 353 U.S. at 42, 77 S.Ct. 635, would forbid an injunction, although a carrier could obtain one if, after giving a § 6 notice conforming to the terms of a contract, a union threatened a strike before the statutory procedures were completed. We do not consider this view to be inconsistent with Order of Railroad Telegraphers v. Chicago & N.W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). There was no showing that the reopener in that case was forbidden by the contract. To the contrary, the Court viewed the union demand which the railroad refused to discuss as being "in obedience" to the command of § 2 First we have just quoted, and thought "it would stretch credulity too far to say that the Railway Labor Act, designed to protect railroad workers, was somehow violated by the union acting precisely in accordance with that Act's purpose to obtain stability and permanence in employment for workers," 362 U.S. at 339–340, 80 S.Ct. at 766. Such language would hardly be apposite to a § 6 notice given in contravention of a contract. From a practical standpoint we can see little difference between an anti-strike injunction pending interpretation by a board of adjustment whether a contract allowed reopening, as was approved in Flight Engineers' Int'l Ass'n v. American Airlines, Inc., *supra*, 303 F.2d 5, and an injunction pending determination by a court whether a prohibition on reopening is illegal. In both cases a temporary injunction serves the important office of preventing disruption of commerce until the parties know what their bargaining duties are.

We therefore order that the injunction be modified so as to eliminate the direction for reference to the Adjustment Board and to provide for prompt determination of the Union's claim of illegality by the district court. We likewise affirm the order denying the Union's cross-motion as premature. No costs.