**LOCAL 553, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Plaintiff,**

v.

**EASTERN AIR LINES, INC., Defendant.**

**No. CV–82–1504.**

United States District Court, E. D. New York.

Aug. 16, 1982.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P. C. by Victor Rabinowitz, Katherine Stone, New York City, for plaintiff.

Poletti, Freidin, Prashker, Feldman & Gartner by Herbert Prashker, Stanley Futterman, New York City, for defendant.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

Plaintiff, Local 553, Transport Workers Union of America, AFL–CIO (the "Union" or "Local 553"), instituted this action on May 28, 1982, alleging that defendant, Eastern Air Lines, Inc. ("Eastern" or the "Company"), has violated certain provisions of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA"). This dispute arises from Eastern's recent agreement with Braniff Airways, Inc. ("Braniff") to take over Braniff's routes to points in Argentina, Bolivia, Chile, Colombia, Ecuador, Panama, Paraguay, and Peru (the "Latin American Routes"), and to hire approximately 310 flight attendants employed by Braniff who reside in and are nationals of five of the eight countries serviced by these routes— namely, Argentina, Chile, Colombia, Panama, and Peru—for a four-year period.

In its amended complaint the Union asserts that Eastern's employment of the Braniff flight attendants is a breach of

section 2(A)(1) of the collective bargaining agreement entered into by Eastern and the Union on February 29, 1980 (the "1980 Collective Bargaining Agreement"). Section 2(A)(1) of that agreement states:

"It is agreed that any and all flying, performed in or for the service of Eastern Air Lines, Inc., will be performed by Flight Attendants whose names appear on the then current Eastern Airlines system seniority list."

The Union further alleges that because the Braniff flight attendants now flying in the service of Eastern are not on the Eastern Air Lines system seniority list, the Company has unilaterally changed the rates of pay, rules, and working conditions of its flight attendants in violation of the status quo provisions of § 6 of the RLA, 45 U.S.C. § 156. Accordingly, says the Union, this is a "major" dispute under the RLA; and the Union is entitled to an injunction to preserve the status quo.

On May 28, 1982, the Union applied to this Court for a preliminary injunction to restore the status quo pending the trial of this action. A hearing on the Union's application for preliminary relief was conducted in May and June 1982. On the basis of the evidence adduced at that hearing, I have determined that the Union is entitled to preliminary relief. The findings of fact and conclusions of law upon which this determination is based are set forth below, as required by Rule 65(a) of the Federal Rules of Civil Procedure.

## STANDARDS FOR ISSUANCE OF A PRELIMINARY INJUNCTION

In general, in order to obtain preliminary injunctive relief in this Circuit, a party must make a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief. *See Jack Kahn Music v. Baldwin Piano & Organ*, 604 F.2d 755, 758–59 (2d Cir. 1979).

## BACKGROUND

On February 28, 1980, the Union and Eastern entered into the 1980 Collective Bargaining Agreement containing section 2(A)(1) quoted above. As the 1980 Collective Bargaining Agreement had an expiration date of March 31, 1982, in January of 1982 each party served upon the other a notice pursuant to § 6 of the RLA, 45 U.S.C. § 156, to change certain rates of pay, rules, and working conditions set forth in the 1980 Collective Bargaining Agreement.

On February 10, 1982, the parties exchanged proposed amendments to the 1980 Collective Bargaining Agreement—each party reserving the right to add, delete or amend the proposals during the course of the negotiations. Neither party proposed any changes to section 2(A)(1).

On April 26, 1982, while the parties were still negotiating a new collective bargaining agreement pursuant to § 6 of the RLA, Eastern and Braniff entered into an Interim Operating and Joint Service Agreement (the "Eastern-Braniff Agreement") pursuant to which Eastern proposed to take over Braniff's Latin American Routes. The Eastern-Braniff Agreement provides that Eastern will assume all of Braniff's liabilities, obligations, rights, and responsibilities as employer of all ground and office personnel and flight attendants employed by Braniff in any of the eight Latin American countries referred to above for a period of four years.

On April 27, 1982, the Civil Aeronautics Board ("CAB") approved the Eastern-Braniff Agreement on an interim basis for a 15-month period. The CAB did not condition its approval by requiring any labor protective provisions, but stated that it might decide to do so after further hearings on the matter. A week prior to approving the Eastern-Braniff Agreement, the CAB had refused to approve an agreement between Pan American World Airways, Inc. and Braniff (the "Pam Am-Braniff Agreement"), under which Pan Am would have taken over Braniff's Latin American Routes, because of possible antitrust prob-

lems. The Pan Am-Braniff Agreement, entered into on March 17, 1982, provided that Pan Am would not hire the Braniff flight attendants based in Latin America.

The Union first learned that Eastern might take over Braniff's Latin American Routes and employ the Braniff flight attendants on April 22, 1982. Union representatives told Eastern officials that they were opposed to Eastern's plan to hire the Braniff flight attendants. The Union and the Company met several times between April 22 and May 27, at which time the parties attempted to negotiate a settlement of the dispute that had arisen due to Eastern's employment of the Braniff flight attendants. The meetings resulted in no agreement between the parties.

Under the Eastern-Braniff Agreement, Eastern was not to commence flying the Latin American Routes until June 1, 1982. However, Braniff filed for bankruptcy under Chapter XI of the Bankruptcy Law on May 13, 1982. This resulted in Eastern's commencing actual flight operations over the former Braniff routes on May 14, 1982.

On May 19, 1982, the Union submitted a grievance to the Company, pursuant to §§ 27 and 28 of the 1980 Collective Bargaining Agreement, asserting that Eastern had violated § 2(A)(1) of the agreement by using flight attendants whose names did not appear on the seniority list. The Union demanded that the Company cease using flight attendants not on the seniority list and remunerate flight attendants on the seniority list who would have flown those flights. The grievance was denied by the Company on June 18, 1982. Apparently, that the grievance has now been submitted to a system adjustment board provided for under the 1980 Collective Bargaining Agreement in an effort to secure a resolution.

It appears that Eastern is now flying the Latin American Routes over the Union's continuing objections in accordance with an arrangement which involves Braniff flight attendants flying all the flights between points in Latin America, Union members flying all the new routes between points in the United States, and with Braniff flight attendants and Union members each flying about one-half of the flying between points in the United States and South America.

## "MAJOR" OR "MINOR" DISPUTE UNDER THE RLA

Although defendant has raised a myriad of issues in opposition to the request for preliminary relief, the initial question to be resolved is whether there is a likelihood that the Union will succeed at a trial of the merits in establishing that this is a "major" dispute, as that term is used in the case law interpreting the RLA.

The general purpose of the RLA, as passed by Congress in 1926, and as amended in 1934, is to "avoid interruptions to transportation resulting from disputes over rates of pay, rules, or working conditions, to provide peaceful and orderly procedures for the settlement of disputes, and to foster the organization of employees." *Rutland Railway Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21, 31 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963). Congress hoped "to encourage the use of the nonjudicial processes of negotiation, mediation, and arbitration for the adjustment of labor disputes." *Brotherhood of R. Trainmen v. Toledo, Peoria & Western Railroad*, 321 U.S. 50, 58, 64 S.Ct. 413, 418, 88 L.Ed. 534 (1944). In 1936, Congress amended the RLA to cover the small, but growing, air transportation industry. 49 Stat. 1189, 45 U.S.C. §§ 181–188. *See Int'l Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 685, 83 S.Ct. 956, 958, 10 L.Ed.2d 67 (1963).

The RLA contemplates two types of labor disputes and provides different procedures for handling each. The courts have denominated these disputes "major" and "minor," although these terms—first used in *Elgin, Joilet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–1290, 89 L.Ed. 1886 (1945)—are not used by the RLA and in fact bear, at times, little relationship to the real dimensions of the matters at issue. *See Rutland, supra* at 42–43 (Marshall, J. dissenting). In essence, a "minor" dispute is one which involves "a dispute

between a carrier or carriers and its or their employees, arising out of grievances or out of interpretation or application of agreements concerning rates of pay, rules, or working conditions." Section 2, Sixth, of the RLA, 45 U.S.C. § 152, Sixth. Major disputes, on the other hand, involve attempts by either a carrier or a union unilaterally to "change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in" a collective bargaining agreement. Section 2, Seventh, of the RLA. 45 U.S.C. § 152, Seventh. In *Elgin, supra,* the Supreme Court set out the general standards for determining whether a dispute is "major" or "minor" as follows:

"The first [major disputes] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class [minor disputes], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future." *Id.* 325 U.S. at 723, 65 S.Ct. at 1290.

Whether the dispute is "major" or "minor" has significant consequences, since, as discussed below, the RLA provides distinctly different dispute resolution procedures for each. *See Elgin, supra* at 722–28, 65 S.Ct. at 1289–1292. However, in both "major" and "minor" disputes, each party has

an obligation to make every reasonable effort to settle the parties' differences in conference. Section 2, First and Second, of the RLA, 45 U.S.C. § 152, First and Second.

If the parties are unable to resolve the dispute, the next steps to be taken under the RLA depend upon whether the dispute is "major" or "minor." If the dispute is major, § 2, Seventh, of the RLA, 45 U.S.C. § 152, Seventh, provides that "[n]o carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees," as embodied in the collective bargaining agreement, except "in the manner prescribed in such agreements or in section 156 of this title." Section 156 of title 45, § 6 of the RLA, provides as follows:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

■ The dispute resolution procedures provided by the RLA for minor disputes are quite different. Under § 2, Sixth, of the Act, 45 U.S.C. § 152, Sixth,

"[i]n case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of interpretation or application of agreement concerning rates of pay, rules, or working

conditions, it shall be the duty of the designated representative or representatives of such carrier or carriers and of such employees, within ten days after the receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such conference shall be held: *Provided,* (1) That the place so specified shall be situated upon the line of the carrier involved or as otherwise mutually agreed upon; and (2) that the time so specified shall allow the designated conferees reasonable opportunity to reach such place of conference; but shall not exceed twenty days from the date of receipt of such notice: *And provided further,* That nothing in this chapter shall be construed to supersede the provisions of any agreement (as to conferences) then in effect between the parties."

If the parties are unable to reach an agreement to resolve the dispute, either party may submit the dispute to compulsory arbitration before an adjustment board. Section 204 of the RLA, 45 U.S.C. § 184. *See Central Airlines, supra* 372 U.S. at 685–89, 85 S.Ct. at 958–960; *Reed v. National Air Lines Inc.,* 524 F.2d 456, 459 (5th Cir. 1975). Where the dispute is minor, the matter is one within the exclusive jurisdiction of the adjustment board to resolve. *See DeLaRosa Sanchez v. Eastern Airlines,* 574 F.2d 29, 31–32 (1st Cir. 1978); *Reed v. National Air Lines, supra* at 460; *Int'l Ass'n of Machinists and Aerospace Workers v. Compagnie Nationale Air France,* 433 F.Supp. 1087, 1090 (S.D.N.Y.), *aff'd,* 573 F.2d 1291 (2d Cir. 1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978).

The determination of whether a particular RLA dispute is minor or major is not an easy matter. "[A]s in other areas of jurisprudence, the difference, on the one hand, between the interpretation and the application of an existing agreement, and, on the other hand, a change in an original intended basis of agreement is often a question of degree," *Rutland, supra* at 33; and in resolving this question, "[one] must not place undue emphasis on the contentions of the parties, [as m]anagement will assert that its position, whether right or wrong, is only an interpretation or application of the existing contract. Unions, on the other hand, in their assertions about the dispute at issue, will obviously talk in terms of change." *Id.*

In order to determine whether a dispute is minor or major, the courts have adopted a number of tests. In *Rutland,* the Second Circuit held a dispute to be minor because the collective bargaining agreement could be "reasonably interpreted" to allow the company's actions. *Id.* at 36. Other courts have held disputes to be minor where a party's assertion that the contract authorized the challenged action was "arguable," *see REA Express, Inc. v. Brotherhood of Railway Clerks,* 459 F.2d 226, 231 (5th Cir.), *cert. denied,* 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972), "not obviously insubstantial," *see United Transportation Union v. Penn Central Transportation Co.,* 505 F.2d 542, 544 (3d Cir. 1974), or "not frivolous," *see United Transportation Union v. Baker,* 499 F.2d 727, 730 (7th Cir.), *cert. denied,* 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974).

In determining whether the 1980 Collective Bargaining Agreement can be "reasonably interpreted" to justify Eastern's actions, it is appropriate to consider the language of the agreement, the negotiating history of the agreement, prior conduct of the parties, and general practice in the airline industry. *Rutland, supra* at 36; *Air Line Pilots Ass'n Int'l v. Northwest Airlines,* 444 F.Supp. 838, 841 (D.Minn.1977), *aff'd,* 570 F.2d 257 (8th Cir. 1978).

■ For the reasons stated below, I conclude that, under any of the tests set forth above, this is a major dispute. Eastern's use of flight attendants not on the seniority list to fly the Latin American Routes acquired from Braniff is not "arguably" justified by the contract; Eastern's contract justifications for its actions are "insubstantial" and "frivolous"; and no "reasonable interpretation" of the contract justifies its position.

As already noted, section 2(A)(1) of the 1980 Collective Bargaining Agreement provides as follows:

"It is agreed that any and all flying, performed in or for the service of Eastern

Air Lines, Inc., will be performed by Flight Attendants whose names appear on the then current Eastern Airlines system seniority list."

The language of the clause clearly prohibits the use of any flight attendant who is not on the current seniority list on an Eastern flight. The words "any and all" serve to emphasize the broad coverage of the clause. Eastern has not denied that its new Latin American Routes are being flown in and for the service of Eastern. Nor does it dispute that it is now using flight attendants on these Latin American Routes who are not on the seniority list. In the face of this clear and unambiguous language, it might seem beyond debate that Eastern is now violating § 2(A)(1) by using persons not on the seniority list to fly as flight attendants in the service of Eastern on the newly acquired routes. Eastern has, however, made a number of arguments in an attempt to show that its use of the Braniff flight attendants is not a violation of that section. Having considered the clear meaning of the language of § 2(A)(1), the negotiating history leading to the inclusion of that section in the 1980 Collective Bargaining Agreement, the past practice of the parties, and the industry practice, I find that defendant's attempt to show that it has not violated § 2(A)(1)—although resourceful—must be characterized as "insubstantial."

First, the Company contends that § 2(A)(1) does not mean what it says because of other provisions of the 1980 Collective Bargaining Agreement. There can be no dispute with the general proposition of contract interpretation that one clause of a contract should not be viewed outside the context of the entire agreement in which it appears. However, the other provisions of the 1980 Collective Bargaining Agreement relied upon by defendant do not even arguably alter the clear meaning of § 2(A)(1).

Eastern contends that, when § 2(A)(1) is read in conjunction with the preamble and § 1 of the agreement, it must be interpreted to apply only to the flight attendants based in the United States, not to foreign-based flight attendants. The preamble provides:

"This Agreement is made and entered into in accordance with the provisions of the Railway Labor Act, as amended, by and between [the Company and the Union], representing the Flight Attendants in the service of the Company."

Section 1 of the agreement, entitled "Recognition," states:

"In accordance with the provisions of the Railway Labor Act, as amended, the Company recognizes the Union as the lawful representative of the Flight Attendants in its service for the purpose of the Railway Labor Act, as amended."

Defendant argues that the RLA prohibits the Union from representing foreign-based flight attendants and that, in any event, the Company would never have agreed to recognize the Union as a representative of flight attendants not based in the United States, since it is not required to do so by the RLA, citing *ALSSA v. Trans World Airlines, Inc.*, 173 F.Supp. 369, 378 (S.D.N.Y.), aff'd, 273 F.2d 69 (2d Cir. 1959), cert. denied, 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021 (1960); and *ALSSA v. Northwest Airlines, Inc.*, 162 F.Supp. 684, 688 (D.Minn.1958), aff'd, 267 F.2d 170, 178 (8th Cir.), cert. denied, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959).[1] Since the phrase

---

1. None of the cases cited by defendant stands for the proposition that the RLA prohibits the Union from representing employees based outside the United States. Rather, they stand for the rule that the RLA does not require airline carriers to recognize unions as representatives of flight attendants who are foreign nationals, based abroad, and who fly on flights wholly outside the United States and its possessions. *See Northwest, supra*, 267 F.2d at 172, 178; *Trans World Airlines, supra* at 378. The *Northwest* and *Trans World Airlines* courts noted that, pursuant to § 1, Fifth, of the RLA, 45 U.S.C. § 151, Fifth, the territorial coverage of the RLA was restricted by the coverage of the Interstate Commerce Act. Because the coverage of the Interstate Commerce Act is limited to transportation that takes place within the United States, 49 U.S.C. § 1(2) [amended and recodified at 49 U.S.C. § 10501(a)(2)(G) ], these courts concluded that the RLA was also limited to transportation taking place within the United States. These cases focused on where the transportation was, not where the

"flight attendants in the service of Eastern," as it appears in the preamble and in section 1, must, according to the Company, be limited to U.S.-based flight attendants, the phrase "flying in or for the service of Eastern," as used in section 2, must be given the same meaning. The trouble with the argument is that there is no evidence that it occurred to anyone responsible for the language actually used in the agreement, or that, when the negotiators used the words "flight attendants in the service of Eastern" or their equivalent in the agreement, they meant those words to mean anything other than what they said.[2]

■ At the time the 1980 Collective Bargaining Agreement was negotiated, the Company did not employ any foreign-based flight attendants and had no plans to employ any. While there is clear evidence detailed below that the Union was concerned about the possibility of the Company's employing either foreign or domestic flight attendants, acquired from another company through merger or otherwise, in the future and that, as a result, it insisted on the inclusion of section 2(A)(1) in the 1980 Collective Bargaining Agreement to prohibit their working in the service of Eastern, to the detriment of the Union's seniority list, there is no evidence that the Company was at all concerned about the question whether the Union would represent any foreign-based flight attendants the Company might acquire from another company. Had it been concerned about the subject of representation of any foreign-based flight attendants acquired from another company, it would presumably have insisted on explicitly excluding such foreign-based employees from both sections 1

and 2, as it did elsewhere in the agreement, particularly because, as the Company notes, the Union could not have insisted on extending the recognition clause to cover foreign-based employees because of the limitations on the territorial scope of the RLA. In the absence of any evidence that the Company was even concerned about the eventuality that it would employ foreign-based employees and that the Union would seek to represent them, the argument that the clear language of section 2(A)(1) must be read as implicitly limited to U.S.-based employees must be rejected as wholly insubstantial.

The negotiations between the Union and the Company leading up to the adoption of § 2(A)(1) show that the Union sought to reach an agreement with the Company which would protect the flight attendants from the perceived threat that the Company might acquire either additional domestic operations or overseas routes by merger or otherwise, including routes between the United States and London, Rio de Janeiro, Buenos Aires, and other Latin American points, and that the Company would employ flight attendants who would not be on the current seniority list and who might be based outside the United States. For example, on March 8, 1979, when the parties first met to negotiate the 1980 Collective Bargaining Agreement, Ernest Mitchell, Vice President of the International Transport Workers Union, told Eastern representatives that the Union intended to preclude Eastern from employing foreign nationals who would not be on the seniority list or covered by the contract. Indeed, Mitchell explicitly said that he wanted to

employees were based, and did not address the issue of whether the RLA required carriers to recognize the unions as the representatives of foreign-based employees who were flying wholly within the territory of the United States or between foreign points and points within the United States.

**2.** Defendant makes a similar argument to the effect that the all-encompassing language of section 2(A)(1) was not intended to mean what it says because it would be illegal for the Union to represent employees in certain of the Latin American countries whose flight attendants are

presently being used by Eastern. The problem with this argument, as with the argument based on the limited territorial scope of the RLA, is that there is no evidence that it formed part of the intention of the drafters of the relevant sections when they chose the language they did for inclusion in the 1980 Collective Bargaining Agreement. It is one thing, in other words, to say that the RLA or the laws of particular Latin American countries limit the enforceability and scope of the parties agreement; it is another thing to say that those laws entered into their choice of words and the meaning of the language they employed.

avoid a situation like the one at Braniff where the Latin American routes were flown by persons represented by foreign unions. There were explicit discussions at this meeting concerning a "scope clause" and concerning the Union's intention not to allow the Company to fly a foreign operation without an agreement. At a further meeting on April 12, 1979, Robert Callahan, President of the Union, again stated that the proposed scope clause would prevent the use of foreign nationals who were not on the seniority list. On November 29, 1979, the Union proposed a scope clause that read as follows:

"It is agreed that any and all flying in and for the service of Eastern Air Lines, Inc. will be performed by flight attendants whose names appear on the then current Eastern Airlines Flight Attendants system seniority list, and all such flying will be done under the then current contract."

At a meeting on December 3, 1979, Roland Passaro, defendant's Director of Industrial Relations for In-Flight Services, again asked the Union representatives what their intent was in proposing the scope clause. Callahan responded that the intent was as it always had been—to avoid a Braniff-type situation where the Company would employ Latin American flight attendants on the foreign routes and American flight attendants on domestic routes. Callahan told Eastern that the then current collective bargaining agreement did not guarantee that Eastern would not do the same thing and that the proposed clause would provide such a guarantee. Callahan further said that the clause would preclude the use of any foreign nationals.

On December 7, 1979, the Company made a counter-proposal which changed the Union's proposal by deleting the words "and all flying will be done under the then current contract." The counter-proposal was accepted by the Union and became § 2(A)(1) of the 1980 Collective Bargaining Agreement. While Eastern seeks to argue that the point of this counter-proposal was to ensure that the Union acquired no contract rights at all as a result of the Company's agreement that "all flying in and for

the service of Eastern ... will be performed by Flight Attendants" on the system seniority list, making of the language left in the agreement an essentially meaningless commitment to list the names of anyone hired to fly in its service, this argument is frivolous. It is clear that the counter-proposal was simply designed to limit the language of the Union's proposal to the essence of what the Union sought, namely, protection of Union members' seniority rights against disruption by the Company's use of new employees acquired by merger or otherwise to fly in Eastern's service. The counter-proposal left to another day issues relating to the contract rights and status of the employees not yet hired vis à vis the Company. As Roland Passaro testified, the deleted phrase was removed simply because it was too open-ended and unnecessarily restrictive of the Company's options with regard to a future situation which had not yet occurred. Nothing in the history of the deletion of this phrase in any way suggests that the application of § 2(A)(1) was intended to be restricted to U.S.-based flight attendants.

The Company also tries to draw support from a pamphlet describing the contract to the Union members prior to ratification, which quoted § 2(A)(1) under a headline stating "Absolute Seniority Protection." The Company notes in this connection that § 2(A)(1) is not referred to as a scope clause and that there is no mention of protection from foreign labor. However, the quoted description of § 2(A)(1) is plainly consistent with the Union's assertion that the clause requires all flight attendants, whether based here or abroad, to be on the seniority list, since labor provisions protective of union members against the claims of both foreign and domestic employees acquired by Eastern by merger or other transaction were precisely what the Union sought.

Evidence of industry practice developed at the hearing is also of no assistance to the Company. In the first place, the language mandating that all flying in the service of Eastern be performed by persons on the system seniority list was, as both parties were aware, directly drawn from identical

language in a ten-year-old provision in Eastern's agreement with its pilots' union, the Airline Pilots Association ("ALPA"). The need for protection of the Union's seniority list by means of such language became clearly apparent in the wake of the Airline Deregulation Act of 1978, 49 U.S.C. § 1301 *et seq.*, and the CAB's announcement in a decision which was handed down immediately preceding the parties' agreement on the language of section 2(A)(1) that it would no longer, in light of the Deregulation Act, impose labor protective provisions as a matter of course in cases involving acquisitions of one airline by another, but would, instead, impose such provisions only in exceptional circumstances. *Texas-International-National Acquisition* case, Docket 33112, *Pan American-National Acquisition* case, Docket 33283, CAB Orders 79–12–163, 79–12–164, and 79–12–165 (October 24, 1979) at pp. 65–69.[3] The language appearing in both its pilots' and flight attendants' agreements was hardly emptied of meaning simply as a result of Eastern's counter-proposal in its negotiations with the flight attendants, stripping the language down to the identical language used in the agreement with its pilots. On the contrary, this evidence makes clear that section 2(A)(1) was intended to mean precisely what it says.

The Company, however, looks to the recognition clauses of several other labor agreements entered into under the RLA, which deal explicitly with the problem of the statute's extra-territoriality, to make the paradoxical argument that its own recognition clause, which does not even allude to the problem, nevertheless implicitly assumed the phrase, all flying in the service of Eastern, to mean all flying by U.S.-based flight attendants in the service of Eastern. In this connection, Eastern notes that the collective bargaining agreement entered into by Braniff and the Association of Flight Attendants on April 1, 1979, has a preamble similar to Eastern's 1980 Collective Bargaining Agreement, but that the Recognition section specifically excludes foreign flight attendants from coverage under the contract as follows:

"For the purposes of the Railway Labor Act ... [Braniff] hereby recognizes the Association of Flight Attendants as the duly designated and authorized representative of the Flight Attendant employees of the [c]ompany who are employed and assigned within the continental United States and who may be assigned by the [c]ompany to Flight Attendant duty outside the continental United States. This Agreement does not apply to Flight Attendants hired outside the continental United States for services outside the continental United States and into the terminal points in the United States of the [c]ompany's international operations, or designated alternates due to flight conditions."

It was clearly not self-evident to Braniff or the Association of Flight Attendants that a recognition clause similar to the one in Eastern's 1980 Collective Bargaining Agreement would exclude foreign-based employees. On the contrary, this contract clearly demonstrates that, had the parties to the Eastern agreement intended to limit their agreement to U.S.-based flight attendants, they could easily have said so expressly[4].

A contract entered into between Trans World Airlines, Inc. and the Independent Federation of Flight Attendants on October 11, 1978 (the "TWA Contract") has a preamble similar to Eastern's 1980 Collective Bargaining Agreement. The recognition clause is also similar, except that it refers specifically to the certification of the union made by the National Mediation Board.

**3.** The Company indeed argues at one point that the broad language of section 2(A)(1) is limited to situations in which new employees are acquired by the Company by merger or acquisition of the type involved in these rulings. Neither the CAB policy statement nor section 2(A)(1) is so limited.

**4.** A similar explicit exclusion of foreign-based flight attendants from the recognition clause is contained in the June 15, 1967 collective bargaining agreement between Northwest Airlines and its union of flight attendants as a result of the arbitration award confirmed in *ALSSA v. Northwest Airlines, Inc., supra,* 162 F.Supp. at 688.

Prior to January of 1975, TWA had employed foreign nationals who were not represented by the union or covered by the contract. In January 1975, however, the parties negotiated a clause, entitled "Scope," which provided as follows:

"All TWA flights flown by the Company which require Flight Attendants on board the aircraft shall be operated in accordance with the provisions of the current Working Agreement, and all Flight Attendants employed by the [c]ompany shall be subject to the provisions of the current Working Agreement."

After this clause was incorporated, in 1975, TWA eliminated its foreign bases; and, since that time, it has employed U.S.-based flight attendants covered by the contract on all domestic and international flights, including flights between foreign points. The history at TWA indicates that the parties to an agreement made pursuant to the RLA may, by agreement, place conditions on the company's hiring of employees that may not be required by the RLA itself. Eastern emphasizes that it rejected language similar to that in the TWA scope clause requiring that all flight attendants be covered by the contract. However, it did not reject the clear language requiring all flight attendants be on the seniority list, leaving to another day the issue what if any contract rights might be enjoyed by new flight attendants who would be added to the bottom of the seniority list.

An agreement entered into between Pan Am and the Independent Union of Flight Attendants, effective August 1, 1974, also cited by the Company in this context, had a preamble similar to Eastern's 1980 Collective Bargaining Agreement and a recognition section which stated that the union "had furnished evidence that in conformity with the Railway Labor Act, as amended," the union was the duly designated representative of the flight attendants and that "the [c]ompany recognizes the [u]nion as the exclusive and sole collective bargaining agency for all [flight attendants]." In 1977, a dispute arose as to whether Pan Am flight attendants based in London could vote in the union's election. On July 15, 1977, the National Mediation Board decided

that, due to the unique circumstances of Pan Am's London base (apparently referring to the fact that Pan Am's London base was staffed by transfers from U. S. bases of flight attendants hired in the United States and that there was frequent rotation of flight attendants to the London base from U. S. bases), London-based flight attendants were eligible to vote in the union election. This appears to have been an exception to the Board's general policy that foreign-based employees may not participate in an election because under the RLA the Board has no jurisdiction over such employees. Again, there is no evidence that this incident, occurring in the context of a union election at another airline, was in the minds of Eastern and Union negotiators when they entered into their 1980 Collective Bargaining Agreement. In all events, the issue here is not the extent of the jurisdiction of the National Mediation Board, but of the scope and meaning of an agreement by private parties relating to matters which may or may not be the subject of mandatory bargaining under the RLA. With respect to this issue, the experience at Pan Am is not particularly instructive.

Defendant also argues that two documents having their origin in prior contracts between the Company and the Union, Documents 32 and 33 annexed to the 1980 Collective Bargaining Agreement, require § 2(A)(1) to be read to apply solely to U. S.-based flight attendants. Document 33 is a letter-agreement, first executed in 1967, which provides that, if Eastern is awarded any new foreign route, the parties "shall promptly . . . meet to negotiate rates of pay, rules and working conditions for Flight Attendants based in the United States who are assigned to fly such routes." Document 32, first executed in 1970, states that, if the "Company establishes a Flight Attendant base outside the contiguous 48 United States, and Flight Attendants covered by the Agreement are to be stationed at such base, the parties shall meet to negotiate provisions such as cost of living differentials, moving expenses, etc., that may be necessary as a result of Flight Attendants being stationed at the new domicile."

Again the Company argues, from the explicit limitation of these clauses to U. S.-based flight attendants, that there must be an implicit limitation read into section 2(A)(1). The first problem with the argument, again, is that the documents on which it is based themselves demonstrate the ease with which the limitation would have been made express if either party had it, in fact, in mind to limit section 2(A)(1) to U. S.-based employees. In all events, there is nothing in the limited commitment made in these two documents that is inconsistent with Company's agreement in section 2(A)(1) to protect the Union's current seniority list against incursions by employees acquired from other companies by merger or otherwise. On the contrary, Documents 32 and 33 are entirely consistent with the intent of the Company's counter-proposal which led to the agreed-upon language of section 2(A)(1). As noted above, the purpose of that counter-proposal was to leave to another day all issues with regard to the status of the new employees except with respect to their impact on the then-current seniority list, including, presumably, such issues as the Company now raises concerning the recognition of the Union as bargaining agent for new employees who are based overseas and their rates of pay, rules, and working conditions under Documents 32 and 33, in the event such employees are U. S.-based.

■ Defendant next argues that it has not, in fact, changed the "actual objective working conditions and practices" of the Union members, *Detroit & Toledo Shore Line R.R. Co. v. United Transportation Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969), and that, because the 1980 Collective Bargaining Agreement expired on March 31, 1982, Eastern is no longer required to comply with § 2(A)(1). Both of these contentions must be rejected. First, the deprivation of a work opportunity involving the type of work traditionally performed by the Union is a change in working conditions, even where the work is new. *See St. Louis S.W. Ry. Co. v. Brotherhood of Signalmen*, 665 F.2d 987, 993 (10th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982); *Southern*

*Ry. Co. v. Brotherhood of Locomotive Firemen*, 337 F.2d 127, 129 (D.C.Cir.1964). Second, § 2(A)(1) remained in force after expiration of the agreement while the parties were negotiating, pursuant to § 6 of the RLA, to establish a new collective bargaining agreement. "The effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination." *Manning v. American Airlines, Inc.*, 329 F.2d 32, 34 (2d Cir.), *cert. denied,* 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964). *See Southern, supra* at 132. *But see Transport Workers Union of America, AFL–CIO, Local 553 v. Eastern Air Lines, Inc.*, No. CV–82–0630 (E.D.N.Y. April 29, 1982), *appeal dismissed,* No. 82–7368 (2d Cir. June 2, 1982).

■ In conclusion, I find that the Union has established that it is likely that it will succeed on the trial of the merits of this action in demonstrating that this is a major dispute under the RLA.

## IRREPARABLE INJURY

Some courts have stated that, where a carrier unilaterally changes the status quo in a major dispute, an injunction shall issue to restore the status quo without requiring a particularized showing of irreparable harm. *See Southern Railway, supra* at 133–34; *United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir. 1972). As the court stated in *Southern Railway,*

"[w]e think that a showing of irreparable injury is not required before the instant status quo injunction may issue, particularly because the question before us is concerned with far more than the private rights of the parties." 337 F.2d 133–34.

I need not decide this issue, however, because plaintiff has, in this case, shown a clear threat of irreparable harm to the Union, its members, and the public as a result of the Company's unilateral violation of the 1980 Collective Bargaining Agreement.

Irreparable injury to Union members of the most traditional sort has been demonstrated by evidence that, in the event the Company is found to have violated section

2(A)(1) by using Braniff flight attendants, it will be exceedingly difficult, if not impossible, to determine the identity of the Union members injured by this violation and the degree of their injury.

Eastern's flights are staffed by flight attendants pursuant to a complex monthly bidding system. While the award of a flight to a particular flight attendant is decided on the objective basis of a flight attendant's seniority, the decision by a flight attendant to bid on a particular flight represents a complex, personal decision by the flight attendant involving objective and subjective elements ranging from the rate of compensation, the layover accommodations, the particular route, the distance from the flight attendant's base, the climate, the time of the year, and the flight attendant's other personal commitments. The denial of these bidding rights, in and of itself, may irreparably deprive the flight attendants of a freedom of selection which is part of the benefits of the work. More importantly, however, any effort to reconstruct the bidding for flights flown by the former Braniff flight attendants in order to determine which of the flight attendants on the current seniority list would have been awarded the flights would involve complex and difficult problems of proof in which a substantial possibility exists that the injured Union member will not be compensated for his or her loss. Moreover, the problem is additionally complicated by the fact that substantial numbers of Eastern flight attendants are currently on so-called "voluntary" leave status, a status they accepted on the Company's representation that there was insufficient work for them and that the alternative was their being laid off. Thus, the Union members ultimately injured may not only be those flight attendants who are denied an opportunity to fly the attractive Latin American routes, but also those persons currently on voluntary leave who might have been recalled to work to serve on flights no longer claimed by more senior flight attendants who would have flown the Latin American routes. Again, the problems of proof implicit in distinguishing between "voluntary" leave that is truly voluntary and voluntary leave taken in order to avoid layoff present complex and difficult issues of proof. In this situation the substantial risk that any particular flight attendant will be unable to demonstrate that he or she, rather than another flight attendant, was injured by the Company's conduct constitutes irreparable harm. However, irreparable injury in other respects peculiar to the transportation industry exists for both the Union and the public.

To permit a unilateral breach of the 1980 Collective Bargaining Agreement by the Company to go unremedied in the context of a major dispute (involving, by definition, a breach for which there is not even arguable justification under the agreement) will either encourage the Union to attempt the same kind of unilateral self-help itself or place the Union in a situation in which its inability to enforce the Company's clearly expressed promises would render the Union a totally ineffectual participant in the collective bargaining process.

This irreparable injury to the Union ties in with irreparable injury to the public at large caused by the breakdown in the RLA processes as a result of a unilateral change in the status quo in the context of a major dispute in the transportation industry. To allow one party to breach a collective bargaining agreement without an even arguable justification in the contract would weaken the overall collective bargaining process and cause irreparable harm not only to the other party, as a participant in that process, but to the public. *See Southern Railway, supra* at 133–34. Moreover, as the Second Circuit recently emphasized, "[a]lthough this Circuit's settled preliminary injunction standard does not explicitly mention the public interest . . . we have recognized that, as a court of equity, we 'may go much further both to give or withhold relief in furtherance of the public interest than where only private interests are involved.' " *Standard & Poor's v. Commodity Exchange, Inc.*, No. 82–7377, 683 F.2d 704 (2d Cir. June 29, 1982), *quoting Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir. 1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976) (citations omitted).

## THE NORRIS–LaGUARDIA ACT

While plaintiff has demonstrated both irreparable injury and a substantial likelihood that it will succeed in establishing that this is a major dispute, there remains for consideration a number of affirmative defenses raised by the Company, the first of which is that plaintiff has failed to plead and prove compliance with §§ 7 and 8 of the Norris-LaGuardia Act, 29 U.S.C. §§ 107, 108.[5]

■ Where both the RLA and the Norris-LaGuardia Act (the "Act") are applicable to an action, there must be "an accommodation of [the Norris-LaGuardia Act] and the RLA so that the obvious purpose in the enactment of each is preserved." *Brotherhood of Railway Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). The issue here is how to properly "accommodate" the RLA with §§ 7 and 8 of the Norris-LaGuardia Act where a carrier has unilaterally changed the rates of pay, rules and working conditions of its employees without first complying with the steps mandated by the RLA. For the reasons stated below, I find that neither § 7 nor § 8 of the Norris-LaGuardia Act bars injunctive relief in the circumstances of this action.

Section 7(b) and (c) of the Norris-LaGuardia Act provides as follows:

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

"(b) That substantial and irreparable injury to complainant's property will follow; [and]

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief."

■ I conclude that § 7(b) and § 7(c) are not applicable to a major RLA dispute where the mandatory dispute resolution process of the RLA has not yet been exhausted. To apply the requirements of § 7(b) and (c) to these disputes would result in severely undermining the purpose of the RLA in many major disputes. *See American Airlines v. Airline Pilots Ass'n Int'l*, 169 F.Supp. 777, 785–89 (S.D.N.Y.1958). To hold § 7(b) and (c) applicable to these major disputes before exhaustion of the procedures of the RLA would mean that a carrier could ignore the mandatory processes of the RLA whenever it had reason to believe that a unilateral change in rates, rules or working conditions would not result in substantial or irreparable injury to its employees or where it concluded that, although the employees might be substantially and irreparably injured by a unilateral change in working conditions, the carrier would suffer even greater irreparable injury itself if the rates, rules, and working conditions were not changed. Such a rule of law would directly contravene the intent of Congress in requiring that "rates of pay, rules, or working conditions shall not be altered by the carrier" during the dispute resolution process set forth in § 6 of the RLA.

The purpose of the RLA is "to avoid any interruption to commerce or to the operation of any carrier engaged therein" and to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions. Section 2 of the RLA, 45 U.S.C. § 151a. Congress

---

5. Defendant has moved to dismiss the complaint for failure to plead compliance with the cited sections of the Norris-LaGuardia Act. The disposition of this motion has been adjourned to the trial of the merits since appropriate accommodation of the RLA and the Norris-LaGuardia Act, and, thus, the need to plead

compliance with the latter, may differ depending upon whether the dispute is finally characterized as a "major" or "minor" dispute. *See Chicago, Rock Island & Pacific R. R. Co. v. Switchmen's Union*, 292 F.2d 61, 63–68 (2d Cir. 1961), *cert. denied*, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962).

hoped that the RLA would encourage collective bargaining in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce. *Shore Line, supra* 396 U.S. at 148, 90 S.Ct. at 298. To hold that the RLA's status quo requirement is unenforceable by the courts in cases where the unilateral change may not cause irreparable injury or where the carrier would suffer greater injury if the change were not made would be inconsistent with the purpose of the RLA, since strikes and other interruptions of commerce are clearly a danger, even where a unilateral change may not cause irreparable injury to the union members or where the carrier is making the change to avoid greater injury to itself. As the Supreme Court said in *Shore Line, supra* at 150, 90 S.Ct. at 299,

> "[t]he [RLA]'s status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the [RLA] gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce."

Further, holding § 7(b) and (c) inapplicable to a major RLA dispute where a carrier has changed rates, rules, and working conditions before completion of the dispute resolution procedure is clearly not in conflict with Congress' purposes in passing the Norris-LaGuardia Act. Congress expressed its purposes in passing the Act as follows:

> "In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are

defined and limited in this chapter, the public policy of the United States is declared as follows:

> "Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted."

§ 2 of the Norris-LaGuardia Act, 29 U.S.C. § 102. *And see Chicago River, supra* 353 U.S. at 40–41, 77 S.Ct. at 640–641.

The issuance of an injunction against a carrier which has violated § 6 of the RLA can hardly be considered inconsistent with Congress' purposes quoted above. *See Chicago River, supra* at 40–41, 77 S.Ct. at 640–641. Accordingly, it is not surprising that it appears that no court has ever declined to enforce the status quo provisions in a major RLA dispute on the ground that injunctive relief would be barred by § 7(b) and (c) of the Act. As stated by the Court of Appeals in *Manning v. American Airlines, Inc.*, 329 F.2d 32, 34 (2d Cir.), *cert. denied*, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964),

> "[t]he propriety of an injunction to enforce the then unique provisions of the [RLA] for maintaining the *status quo* while the parties to a labor dispute pur-

sue various stages of negotiation, mediation or arbitration was established long ago. Although the *Texas & N.O. [R.R.,* 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930),] decision antedated the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, the debates on that Act, 75 Cong.Rec. 5503–04 (1932), made clear that it was not intended to apply to injunctions of this nature." (Citations omitted.)

*And see Seaboard World Airlines v. Transport Workers Union,* 425 F.2d 1086, 1091 (2d Cir. 1970); *Pan Am v. Flight Eng. Int'l Ass'n,* 306 F.2d 840, 846–47 (2d Cir. 1962); *Chicago, Rock Island & Pacific R. R. Co. v. Switchmen's Union, supra* 292 F.2d at 66; *Rutland, supra* at 32, n.6; *American Airlines v. Air Line Pilots, supra,* 169 F.Supp. at 785–89; Comment, *Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes,* 60 Colum.L.Rev. 381, 387–91 (1960). Although the court in *Southern Railway, supra,* was not specifically addressing the Norris-LaGuardia Act, its reasoning is applicable here:

"[W]e think that a showing of irreparable injury is not required before the instant status quo injunction may issue, particularly because the question before us is concerned with far more than the private rights and duties of the parties. In the first place, section 6 of the Act imposing the duty to maintain the status quo contains no qualification to the effect that the carrier has no obligation to do so unless irreparable injury would otherwise result. Moreover, the public interest in peaceful settlement of labor disputes through utilization of statutory procedures is involved, and irreparable injury to the complaining party is not an element which bears significantly or relevantly on furthering the public interest."

337 F.2d at 133–34 (citation omitted).

I next turn to the proper accommodation between § 8 of the Norris-LaGuardia Act and the RLA in this situation.

Section 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, provides:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

Unlike § 7(b) and (c), § 8 does not conflict with the mandatory status quo provisions of the RLA. Rather, § 8 is in harmony with the purposes of the RLA. *See Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad, supra,* 321 U.S. at 55–63, 64 S.Ct. at 416–420; *Rutland, supra* at 38–42. Section 8 does not conflict with the status quo provisions of the RLA because § 2 First and Second, 45 U.S.C. § 152, First and Second, of the RLA imposes requirements that are consistent with the requirements set forth in § 8. *See Toledo, supra* at 61, 64 S.Ct. at 419.

In addition, to hold § 8 applicable to a major dispute before resolution of mandatory bargaining procedures would not render the status quo provision of the RLA ineffective in any major dispute. Rather, it merely requires the party seeking a status quo injunction to do what would essentially already be required by the RLA. In addition, holding § 8 applicable to major RLA disputes furthers the purpose of Congress in passing the RLA—to encourage the non-judicial processes of negotiations, mediation, and arbitration to resolve these disputes. *Toledo, supra* at 58, 64 S.Ct. at 417–418.

Turning to the facts of this case, I find that § 8 of the Act does not bar injunctive relief because the Union has complied with all obligations imposed by law involved in this dispute and has made every reasonable effort to settle the dispute by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

Eastern contends that the Union has failed to comply with § 2, First and Second, of the RLA, 45 U.S.C. § 152, First and Second, and that, therefore, the Union has failed to comply with an obligation imposed by law. The cited provisions state:

1332

"First. It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

"Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and· by the employees thereof interested in the dispute."

 I find no basis for a conclusion that the Union violated these provisions. After learning that Eastern contemplated hiring the Braniff flight attendants, the Union made numerous efforts to settle the dispute in conference. Although the Company contends that these were simply Document 33 conferences at which the employment of the Braniff flight attendants was not an issue, the evidence is clear that both parties used these meetings to confer and negotiate concerning the dispute over the Company's employment of the Braniff flight attendants. The Company's argument, that the Union's proposal that it represent the former Braniff flight attendants constituted a failure to attempt to settle the dispute in good faith, since such representation was not required by the RLA or the 1980 Collective Bargaining Agreement, must also be rejected. The Union did not insist on representation of the foreign-based flight attendants to the point of impasse. Thus, even assuming that recognition of the Union as representative of foreign-based flight attendants was not a mandatory subject of bargaining, the Union's approach did not run afoul of § 2, First or Second, of the RLA. *Cf. Japan Air Lines Company, Ltd. v. Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO*, 538 F.2d 46, 51–53 (2d Cir. 1976). On the contrary, the Union's negotiations concerning representation of the Braniff flight attendants clearly related to the job security of persons already members of the Union. *See Japan Air Lines, supra* at 52.

In addition, I find that the Union has made "every reasonable effort to settle the dispute either by negotiation or with the aid of any available governmental machinery of mediation of voluntary arbitration." As soon as the Union learned of the possibility that Eastern would hire the Braniff flight attendants, the Union made a number of proposals to resolve the situation, none of which were pushed to impasse. For example, at a May 3, 1982 meeting, the Union stated that it would not object to Eastern's employment of the Braniff flight attendants if the U. S.-based flight attendants were given a raise or if Eastern agreed to fly double crews. And at a May 13 meeting, the Union suggested that the dispute could be resolved if, among other conditions, (1) no foreign nationals were permitted to enter the United States; (2) U. S. flight attendants were permitted to fly throughout South America; (3) no new foreign nationals would be hired, allowing attrition; and (4) no layoffs of U. S.-based flight attendants would be made so long as foreign nationals were not on the seniority list. These proposals were clearly not unreasonable efforts to resolve the dispute. None of these proposals was accepted by defendant. Instead, on May 14, the Company unilaterally accelerated the schedule for flying the Braniff routes. On May 19, 1982, the Union sought to submit this dispute to arbitration through the grievance procedure of the 1980 Collective Bargaining Agreement. No more was required of it by § 8 of the Norris-LaGuardia Act. *See Toledo, supra* 321 U.S. at 56–64, 64 S.Ct. at 416–420. *Cf. Transport Workers Union v. Argentine Airlines*, 479 F.Supp. 625, 633 (S.D.N.Y. 1979); *Erie Lackawanna Ry. Co. v. Lighter Captains Union*, 338 F.Supp. 955, 963 (D.N. J.1972); *American Airlines, Inc. v. Airline Pilots Ass'n Int'l, supra*, 169 F.Supp. at 794.

## OTHER AFFIRMATIVE DEFENSES RAISED BY EASTERN

Defendant has raised a number of other affirmative defenses in addition to those

discussed above. For the reasons stated below, I find that none of these defenses bars the Union from obtaining preliminary injunctive relief.

First, Eastern contends that this action falls within the exclusive jurisdiction of the National Mediation Board pursuant to § 2, Ninth, of the RLA, 45 U.S.C. § 152, Ninth.

■ Defendant is correct in stating that the National Mediation Board (hereinafter referred to as the "Board") has exclusive jurisdiction to decide representation disputes. *See Air Line Pilots Ass'n v. Texas Int'l Airlines*, 656 F.2d 16, 23 (2d Cir. 1981); *Ruby v. American Airlines, Inc.*, 323 F.2d 248, 257 (2d Cir. 1963), *cert. denied*, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611. However, this case is not a representation dispute. Plaintiff's counsel has made clear since this case was filed that the Union does not seek to represent the Braniff flight attendants, although the Union proposed to undertake representation of them as part of one of its efforts to negotiate a settlement. The dispute is one concerning whether Eastern has unilaterally changed the rates of pay, rules, and working conditions of Union members as set forth in § 2(A)(1) of the 1980 Collective Bargaining Agreement by using persons not on the seniority list to fly in the service of Eastern. As such, it is within the jurisdiction of this Court to preserve the status quo pending efforts to resolve the dispute.

■ Second, defendant contends that exclusive jurisdiction to hear this matter is in the Court of Appeals, pursuant to the Federal Aviation Act, 49 U.S.C. § 1486. Section 1486(a) provides:

> "Any order, affirmative or negative, issued by the [CAB] under this chapter . . . shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition."

The Court of Appeals is to transmit a copy of the petition to the CAB or the Administrator of the Federal Aviation Administration. 49 U.S.C. § 1486(c). Section 1486(d) states that "[u]pon transmittal of the petition to the [CAB] or Administrator, the court shall have exclusive jurisdiction to affirm, modify, or set aside the order complained of."

If plaintiff's action was in effect a petition to review the CAB's April 27 decision to approve the Braniff-Eastern transaction, then defendant's jurisdictional argument would have some force. However, plaintiff is plainly not here seeking review of the CAB's order.

On April 27, 1982, the CAB issued an order granting 15-month approval pursuant to § 412 of the Federal Aviation Act, 49 U.S.C. § 1382, of the "Interim Operating and Joint Service Agreement" entered into by Eastern and Braniff on April 26, 1982. The CAB also conferred on the parties antitrust immunity pursuant to § 414 of the Federal Aviation Act, as amended, 49 U.S.C. § 1384. The Union challenges neither of these rulings of the CAB. Nor does it complain of the failure of the CAB to issue labor protective provisions under its general authority to issue such provisions, which take precedence over the provisions of a labor agreement otherwise binding on one of the parties to the approved transaction. *Kent v. CAB*, 204 F.2d 263 (2d Cir.), *cert. denied*, 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953). Instead, it seeks to enforce the particular labor protective provisions it negotiated and embodied in the 1980 Collective Bargaining Agreement. Since this action is not, in form or substance, a collateral attack on the CAB's April 27, 1982 Order, there is no basis for a finding that the Court of Appeals has exclusive jurisdiction over the case.

Third, Eastern asserts that the Union is barred from seeking relief from this Court because the Union has elected to resolve this dispute before the System Board of Adjustment—the means of resolution required by the RLA and the 1980 Collective Bargaining Agreement where a minor dispute exists.

■ On May 19, 1982, as already noted, the Union submitted a grievance, in accordance with §§ 27 and 28 of the 1980 Collective Bargaining Agreement, asserting that the Company had violated Section 2(A)(1) by using flight attendants whose names did

not appear on the seniority list and requesting that the Company remove those flight attendants whose names did not appear on the seniority list and that all hours flown by those flight attendants be paid to flight attendants on the seniority list who would have bid and flown such flights. On June 18, 1982, after an initial hearing on the matter, the Union's grievance was denied. Thereafter, on June 23, 1982, the Union sent a letter to John Wilson, Chairman of the Flight Attendants' Adjustment Board seeking to submit the grievance to the adjustment board. Eastern argues that this June 23, 1982 letter constitutes an election by the Union to have its claim heard and determined by the adjustment board—the characteristic means of resolution of a minor dispute. As a result of this election, Eastern argues, the Union is barred from seeking relief from this Court.

I find defendant's argument to be without merit. The Union has consistently sought to resolve this dispute as quickly as possible and, thus, has pursued several remedies, including this action, simultaneously. Its effort to resolve the issue through the grievance procedure of the 1980 Collective Bargaining Agreement and the adjustment board and its effort by application to the CAB to impose labor protective provisions hardly constitute an election of remedies, particularly in light of the mandate of the Norris-LaGuardia Act that it seek every available legal avenue of redress. In all events, the Union seeks injunctive relief in this action whether this dispute is found to be major or minor. An injunction can only be issued in a minor dispute where the matter is pending before an adjustment board. *See, e.g., Westchester Lodge 2186 v. Railway Express Agency*, 329 F.2d 748, 753 (2d Cir. 1964). Clearly, it would be in no one's interest and contrary to the purposes of the RLA in seeking the orderly resolution of disputes in the transportation industry to require any party to elect at the very outset of the dispute between alternative means of resolving it on peril of being barred from later seeking injunctive relief in the event its initial characterization of the dispute was wrong. Eastern has in no way been prejudiced by the Union's cautious procedure, nor are any of the other characteristics of a binding election of remedies present on this record.

### RELIEF

Finally, Eastern makes several arguments based upon the labor laws and political situation in the five Latin American nations in which the Braniff flight attendants reside—Panama, Colombia, Peru, Argentina, and Chile—which bear most directly on the form of relief to be granted. The Company contends that the laws of these countries required it to hire the Braniff flight attendants and currently require it to continue them in their position as flight attendants. Eastern says that these foreign laws would not have allowed Eastern to transfer these Braniff flight attendants to other jobs or to simply pay the Braniff flight attendants without using them to fly these routes. Further, Eastern asserts that, if it does not continue to employ the Braniff flight attendants as they were employed by Braniff, it is likely that Eastern will not obtain the necessary approval from these countries to fly the new routes, thus causing irreparable harm to Eastern's new Latin American operations and the network of routes established in Latin America.

In this connection, defendant has presented evidence with respect to the labor laws and political climate in Peru, Colombia, Panama, Chile, and Argentina.

With respect to Peru, there is evidence that Peruvian officials believed that Pan Am would have violated the law of Peru if it had taken over the Braniff routes without employing Braniff's Peruvian flight attendants pursuant to the March 17, 1982 Pan Am-Braniff Agreement. In addition, there is evidence that government officials were concerned about Pan Am's agreement not to hire the Peruvian flight attendants and that the Peruvian union representing Braniff's flight attendants, the Sindicato de Empleades of Braniff International, was strongly opposed to Pan Am's decision not to hire the Peruvian flight attendants. It appears that the Peruvian authorities have granted Eastern permission to fly three

flights a week to Peru, but have not yet authorized Eastern to start a more extensive schedule of eleven flights per week which Eastern has requested. Eastern now employs about 85 Peruvian flight attendants.

As for Colombia, it appears that Colombian officials told Pan Am that it would be unable to operate in Colombia if it did not hire Braniff's Colombian flight attendants. Also, Colombian authorities threatened to prohibit Braniff from operating in Colombia if Braniff closed its flight attendant base located in Colombia. Further, it appears that, pursuant to Article 9 of the Colombian labor code, the Colombian equivalent of the CAB may have been required to condition Eastern's operating rights on Eastern's agreement to employ the Braniff flight attendants. Any termination of the Colombian flight attendants would have to be approved by the Colombian Ministry of Labor.

Eastern obtained provisional permits issued by the Colombian authorities on May 12, and May 31, 1982, both of which state that they were issued with the understanding that Eastern would continue to employ Braniff's Colombian flight attendants. Eastern currently employs about 80 Colombian flight attendants, who are represented by a union which represents all Colombian flight attendants.

With regard to Panama, on May 12, 1982, Eastern submitted a petition to Panamanian authorities for operating rights in which it agreed to employ Braniff's Panamanian flight attendants. On May 13, 1982, at the request of the Panamanian Ministry of Labor and Social Welfare, Eastern informed the union representing the Panamanian airline employees, the Industrial Union of Air Line Employees and Similars of the Republic of Panama, that it would employ the Braniff flight attendants. Under Panamanian law, it appears that Eastern, as the substitute employer, may only terminate 10% of its labor force in Panama in one year.

On May 17, 1982, Eastern was issued a provisional permit, enabling it to operate in Panama, which recites Eastern's agreement to employ Braniff's Panamanian personnel. Eastern presently employs about 55 Panamanian flight attendants.

With regard to Chile, Eastern received a permanent permit to operate after agreeing to continue the terms of the contract between Braniff and the union representing the Braniff flight attendants. Eastern now employs about 50 flight attendants based in Chile.

Eastern has not yet obtained any operating permits to fly to Argentina, apparently because of strained relations between Argentina and the United States. Eastern now employs about 50 Argentinian flight attendants.

Eastern has obtained temporary operating permits in Bolivia, Ecuador, and Paraguay. Eastern employs no flight attendants in these countries.

Finally, there is evidence that it may be unlawful for Local 553 to represent flight attendants in Colombia, Panama, Chile, and Argentina due to laws in those countries which require a certain percentage of nationals in the union or which require nationals in union leadership positions.

 Even assuming that the foregoing correctly portrays the laws and political reactions of these countries to any change in the employment status of the Braniff flight attendants, I do not find this to be a basis for denying the preliminary injunctive relief today ordered by this Court.

 First, it bears emphasis that it was Eastern, not the Union, that agreed to take over Braniff's Latin American Routes and employ the Braniff flight attendants. When Eastern made this agreement, it was fully aware that (1) both foreign law and foreign governmental policy might compel it to hire the Braniff flight attendants, and (2) the Union strongly objected to the hiring of the Braniff flight attendants. Eastern, having voluntarily decided to take over the Braniff routes and hire the Braniff flight attendants, may not now argue that a return to the status quo in the form herein directed will cause it hardship. *See Air Line Pilots Ass'n Int'l v. Northwest*

*Airlines, supra*, 444 F.Supp. at 842 (In a major dispute a carrier may not invest in a venture, the imposition of which would require working conditions not permitted by the contract and then claim that possible loss of the investment constituted irreparable harm). A carrier may not, in other words, avoid the dispute resolution procedures of the RLA on the ground of economic necessity. *See United Industrial Workers of Seafarers v. Galveston Wharves*, 351 F.2d 183, 189–90 (5th Cir. 1965). Here, a carrier should not be able to avoid its RLA obligations based upon foreign law where it has voluntarily put itself in a situation where it knew those laws would be applicable.

Second, the injunction issued today will not require defendant to terminate the Braniff employees; it simply requires Eastern to preserve the status quo by either using its employees on the current system seniority list to fly its Latin American flights or compensating those on the seniority list who would otherwise have flown those flights for the loss resulting from the Company's unilateral departure from the requirements of the 1980 Collective Bargaining Agreement.

Accordingly, commencing forthwith, and pending the trial of this action, the Company shall post all flights flown after August 23, 1982, at 9:00 a. m. (E.D.T.) over its Latin American Routes acquired from Braniff and shall award such flights in accordance with system seniority.

Eastern may elect to use those persons to whom such flights are awarded as flight attendants on such flights or, alternatively, if it believes that the use of a U. S.-based flight attendant may jeopardize its ability to operate in Latin American, to compensate such flight attendant in accordance with the terms and conditions of the 1980 Collective Bargaining Agreement or any new agreement entered into between the parties as though that flight attendant had flown the flight, without using that flight attendant on such flight.

Announcements of the Company's intention not to use flight attendants to whom such flights have been awarded shall be made at least two days prior to the date on which the flight is scheduled to commence.

The Union shall, as security for this preliminary injunction, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, post a bond in the amount of $10,000 to secure the payment of such costs and damages as may be incurred or suffered by the defendant in the event defendant is found to have been wrongfully enjoined or restrained. The amount of such security may be increased from time to time on application of the Company to take into account amounts paid by the Company to flight attendants to whom flights are awarded who are not used on flights over the Latin American Routes acquired from Braniff.

SO ORDERED.